■ WILLIAMS, J.
_JjThe defendant, Bradley Berry, was charged by bill of indictment with aggravated rape, in violation of La. R.S. 14:42, and indecent behavior with- a juvenile, in violation of La. R.S. 14:81. Following a jury trial, he was found guilty as charged. For the aggravated rape conviction, the trial court sentenced the defendant to serve life in prison at hard labor without the benefit of parole, probation or suspension of sentence. He was sentenced to serve seven years at hard labor for his indecent behavior with a juvenile conviction. The sentences were ordered to run concurrently. For the following reasons, we affirm the defendant’s convictions and sentences. We remand this matter to the trial court with instructions to provide the defendant with the appropriate notice with regard to the sex offender registration requirements.
FACTS
The defendant, Bradley Berry, is the half-brother of C.B.,[1] one of the victims in this case.[2] C.B.’s date of birth is August 2, 1997, and he was 15 years old at the time of the offenses. J.B., the other victim in this case, is the defendant’s second cousin, J.B., whose date of birth is July 10, 1992, was 10 years old at the time of the offense.[3]
lain March 2013, the defendant was released from prison and moved back home with his father,[4] Approximately one week after the defendant’s return home, C.B,, who lived a short' distancé away, went to visit his father (J.W.B.) at the home his father shared with the defendant. -
During the trial, C.B, testified as follows: he and the defendant went into a bedroom to listen to music; while in the bedroom, the defendant asked C.B. to show him the size of his penis; the defendant began performing oral sex on him; C.B. then performed oral sex on the defendant; the defendant apologized for ejaculating into C.B.’s mouth; the defendant told him, “I don’t think it’s wrong if we don’t tell anybody”; the defendant asked C.B. to tell him “how the] got Timothy off’[5]; and, on another occasion, the defen *972 dant went to C.B.’s home and masturbated in C.B.’s presence then performed oral sex on him.
In August 2013, C.B. told his mother, R.M., about the sexual incidents, but begged her not to tell anyone because he was afraid that people would think he was “gay.” Additionally, C.B. stated that he did not want the defendant to “go to jail for a long time.” R.M. did not report the incidents at that time.
On April 14, 2014, R.M. went to the Richland Parish Sheriffs Office and reported that the defendant and Timothy had “messed with” C.B. An investigation ensued. Wanda Vallery, a sheriffs office investigator, interviewed R.M. and C.B.
laOn April 26, 2014, C.B. published a Facebook post about the sexual abuse. J.B. responded to the Facebook post in a private message, and the following messages where exchanged between C.B. and J.B.:
J.B.: Sorry about that Cuz[;] I didn’t know[.]
C.B.: It’s ok[.]
J.B.: I know how you feel[;] believe me[.]
C.B.: Really[?]
J.B.: Yea[;] just never told anyone[;] embarrassed by it[.]
C.B.: Oh[.]
So what happened[?] If [you] don’t mind[,] tell me[,] and if you don’t want to[,] that’s ok too[.]
J.B,: *:|!*****UNABLE TO READ****- ***[6]
C.B.: Oh[.] I’m so sorry big man[.] [Tjhat’s terrible[.] How old were you[?]
J.B.: About ten[.]
***
Subsequently, Investigator Vallery questioned J.B. about the comments he made on Facebook. J.B. informed Investigator Vallery that the defendant entered his bedroom “during the night,” pulled his pants down and performed oral sex on him. J.B. was unable to recall the exact date of the sexual incident; however, he was able to recall that he was between 8 and 10 years old at the time. J.B. also stated that the incident occurred at J.W.B.’s home, where J.B. was living with his grandmother.[7]
The defendant was arrested and charged by bill of indictment with the aggravated rape of J.B., in violation of La. R.S. 14:42, and indecent behavior with a juvenile with regard to C.B., in violation of La. R.S. 14:81.
Prior to trial, the state filed a notice of intent to use other crimes Revidence, ie., the defendant’s 2000 conviction for carnal knowledge of a juvenile and his 2007 convictions for carnal knowledge of a juvenile and contributing to the delinquency of a juvenile. In response, the defendant filed a motion to exclude the other crimes evidence, arguing that the prior convictions “involved facts and circumstances dissimilar to [those] present in this case.” Following a hearing, the trial court denied the defendant’s motion to exclude the evidence of other crimes. The court stated:
[A]rticle 412.2 ... was enacted along with some of the case laws ... which indicate a lustful—lustful disposition to *973 ward children may be admissible and that would be considered for bearing on any matter which was relevant for the balancing test, and it does ... require the Court to' do a balancing test and balance the prejudice against the defendant versus the probative value of the charges[.] *** I believe the probative value outweighs the prejudice because I can give an instruction which will instruct the jury ... that they’re not to use this but only use it for the limited purpose of the other crimes evidenced]
The defendant’s trial commenced on December 14, 2015. During the trial, Investigator Vallery testified with regard to the investigation and her interviews with R.M., C.B. and J.B. She stated that C.B. provided her with the password to his Facebook account and she read the messages that C.B. and J.B. had exchanged. Investigator Vallery also testified that she printed the messages from Facebook and subsequently interviewed J.B. to obtain his statement.
On cross-examination, Investigator Val-lery admitted that, in the Facebook post, J.B. stated that he was 10 years old when the aggravated rape occurred. However, during his interview, he recalled that the incident occurred when he lived with his grandmother, when he was between the ages of 8 and 10. Investigator Vallery further admitted that she did not 1¿¡attempt to collect any physical evidence of the rape. She explained that she did not attempt to do so because the rape had occurred approximately 10 years before it was reported.
During her cross-examination with regard to C.B.’s allegations, Investigator Vallery admitted that R.M. stated in her interview that only one sexual incident occurred between the defendant and C.B. However, she explained that the confusion may be attributable to the fact that R.M. was “telling me about Timothy and [the defendant] at the same time[.]” Further, Investigator Vallery testified that C.B. was able to “remember for sure” two sexual incidents involving the defendant and “possibly a third[.]” She stated that C.B. reported that the improper sexual encounters may have occurred “two or three times, but he specifically remembered those two incidences[.]” Additionally, Investigator ' Vallery testified that C.B.’s statements were the only “tangible proof’ of the sexual encounters between him and the defendant. ■
At the time of the-trial, C.B. was 18 years old. He testified as follows: the defendant moved back to the family’s property in March 2013; at that time, the defendant lived in a house with J.W.B.; he (C.B.) lived nearby in a mobile home with his mother, stepfather and siblings; on the day the first incident of sexual abuse occurred, he went to the home to visit his father; his father and stepmother left to attend church; the defendant invited him into his bedroom to listen to music; as they listened to music, he asked the defendant, “Do you think [masturbating is] a sin?”; the defendant asked him, “How did you get Timothy off?”; shortly thereafter, the defendant asked, “Can I see how big yours is?”; he understood that the defendant was referring to his “private part”; he told the defendant, “Yes” and “pulled it out R... and he started sucking me and then I was ... sucking his private part”; the defendant ejaculated in his mouth and told him, “I’m sorry”; when he got ready to leave, the defendant told him, “I don’t think it’s wrong if you don’t tell anybody”; the second incident occurred at his (C.B.’s) house; the defendant came to his house and they went into his bedroom; the defendant started playing with himself then began “messing with my private parts and then he started sucking my private parts and then I started sucking his, but I stopped”; *974 the defendant told him “Don’t tell anybody”; he does not recall a third sexual encounter involving the defendant; initially, he did not tell anyone about the sexual abuse and considered committing suicide; he finally decided to tell his mother “what happened with” the defendant and Timothy; he asked his mother not to “go to the police’.’ because he “didn’t really know what to do”; he was worried that “if [he] told it, [the defendant] would go to jail for a long .time”; he eventually went to live with his aunt who “already knew about it”; his aunt asked “if it was true”; when he confirmed that the encounters occurred, his aunt persuaded ’him to report the incidents to the sheriffs office; he was interviewed by Investigator Vallery; he was 15 years old when the incidents occurred; he made a Facebook post about his feelings regarding the incidents; and J.B. responded that “the same thing” had happened to him.
On cross-examination, O.B. testified as follows; during his interview with Investigator' Vallery, he initially stated that the first sexual encounter with the defendant occurred at his home and the second incident occurred at the defendant’s home; after the incidents, he continued to visit his father’s home when the defendant was “off working”; and he recalled telling Investigator Vallery that he had two sexual encounters with the defendant 17and “numerous” encounters with Timothy.
J.B. was 23 years old at the time of trial. He testified as follows: he was “kind of raised” by his grandmother at J.W.B.’s residence; during that time, the defendant lived “in and out of the house”; when he was “about ten years old,” he awakened during the night to find the defendant in his bedroom “playing with [him], sucking on .., [his] penis”; he was asleep when the defendant entered the room, but he “woke up and [his] pants were down and, [the defendant] was doing it”; the defendant did not say anything to him at the time; he believes he was 10 years old at the time of ,the incident because he remembers that he was in the fifth grade and that he had to get up for school the following day;[8] he told C.B. about the incident with the defendant because C.B. “was going through a hard time” and he wanted to “try to give him a little support”; he did not tell anyone about the incident at the time because “[i]t was just kind of an embarrassment”; he saw the defendant “a lot” after the incident and he “just kind of acted like it never happened, went on about [his] life”; .he never had a conversation with the defendant about the incident; and in 2007, he was present in the motel room when the defendant had sexual intercourse with his then-15-year-old female cousin.
On cross-examination, J.B. testified that he was unable to recall the | Sspecific date the defendant raped him. He stated, “After you sit there for fifteen years and try to block something out[,] I mean—you just might have a little trouble—you have to think about it a while.” J.B. also testified that he was unable to recall how many people he spoke to about the rape since he revealed the incident to C.B. Further, J.B. *975 stated that he first told Investigator Val-lery that he was eight or nine years old when the defendant committed the offense. J.B. reiterated that the offense occurred during the night. He stated, “I woke up and my pants were, down and he was—had his mouth on my thing.” Additionally, J.B. testified that he told Investigator Vallery that Timothy had done “the same thing that [the defendant] did[,]" Thereafter, J.B. testified that he was certain that it was the defendant, and not Timothy, who performed oral sex on him that night. He explained that although it was dark outside, he could see the defendant from the light shining through the window.[9] Further, J.B. testified that he continued to see lathe defendant and would “hang out with him like nothing happened” because “it was just kind of an embarrassment to think about it, and you kind of hope a person wouldn’t ever do that kind of stuff again[;] I mean it’s your cousin you’ve always been around you know, you don’t see them like that.” Additionally, J.B, admitted that, other than his testimony, he did not have “any other kind of evidence or proof that [the rape] actually happened.”
R.M., C.B.’s mother, also testified at trial. She stated that she recalled C.B. telling her about the sexual abuse shortly before his 16th birthday. She stated that C.B. told her that the defendant “made him” have “oral sex with him” on two occasions.
: On cross-examination, R.M. -testified as follows: she did not report the sexual abuse to the police department initially because C.B. “didn’t want me to do it right then”; she told- Investigator Vallery that the defendant had performed oral sex on C,B. on one occasion; she could not remember the exact month or day that C.B. told her about the incidents; and she never witnessed any sexual conduct between the defendant and C.B.
S.B., the brother of the defendant and the half-brother of C.B., testified as follows: in 2014, C.B. told him about the incidents with the defendant; he “very distinctly remember[s]” C.B, telling him that he was 14 |inyears old when the incidents occurred; and the incidents could not have occurred because the defendant was incarcerated when C.B. was 14 years old.
On cross-examination, S.B. testified, as follows: C.B. told him that the defendant had “fooled with” him on more than one occasion; he did not recall when the defendant returned home after being released *976 from prison; he believed C.B. was “lying to the jury”; he did not tell the' sheriffs office or the district attorney’s office about his suspicions that C.B. was not being truthful; he was unaware that C.B. told Investigator Vallery that he was 15 years old when the incidents occurred; he believes J.B. is “a liar”; he believes the 15-year-old female relative with whom the defendant had sexual intercourse with was being truthful; and he believes Investigator Val-lery was “absolutely” lying about the incidents.
A.B., S.B.’s wife, corroborated S.B.’s testimony that C.B. told them that he was 14 years old when the incidents with the defendant took place. She stated that C.B.’s statements “just sounded retarded” because she believed the defendant was incarcerated when C.B. was 14 years old. A.B. also testified that she believes the defendant “is innocent” and could not have committed the crimes against C.B. On cross-examination, A.B. admitted that she did not inform law enforcement that the defendant was incarcerated and could not have committed the crimes against C.B. She also stated that she believes C.B. “was mistaken” about the allegations.
J.W.B., the father of the defendant and C.B., also testified that C.B. told him that he was 14 years old when , the incidents occurred, and that the defendant was incarcerated during that year. On cross-examination, J.W.B.’ testified as follows: he talked to C.B. about the allegations at C.B.’s lnwedding in September 2015; he did not offer C.B. money and a truck to recant his statements against the defendant; he was not surprised by the nature of C.B.’s allegations, but he was surprised by the timing; he was not aware that C.B. told the investigator that he was 15 years old when the incidents occurred; he did not tell police officers or the district attorney’s office that the defendant was incarcerated during the time C.B. alleged the abuse took place; he believes the defendant should “be punished” if he committed the acts against C.B. and J.B.; and he could not testify that either C.B. or J.B. was lying about the incidents.
C.B. was called to testify as a rebuttal witness. He testified as follows: he did not tell anyone that he was 14 years old when the defendant committed the acts; he was 15 years old when the incidents occurred; his father offered to give him a truck and partial ownership in a house in exchange for recanting his allegations against the defendant; his father approached him at his wedding in September 2015 and attempted to persuade him to “come up here and say none of this ever happened”; the first time the defendant performed oral sex on him occurred approximately one week after the defendant was released from prison in 2013; and the defendant was in prison when he (C.B.) was 14 years old.
C.B.’s wife testified that she was present in the vehicle during the conversation between C.B., S.B. and A.B. She stated that C.B. did not mention how old he was when the incidents occurred.
At the conclusion of the trial, the jury found the defendant guilty as charged. The trial court sentenced the defendant to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence for the aggravated rape conviction and seven years at hard labor for the |i2indecent behavior with a juvenile conviction. The sentences were ordered to run concurrently.
The defendant now appeals.
DISCUSSION
The defendant contends the evidence was insufficient to support his convictions. He argues that the testimony of the victims was inconsistent with their prior *977 statements to law enforcement officers. He also argues the victims’ statements were unreliable due to the “extended delay” in reporting the incidents.
The standard of appellate review of a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La. 5/20/03), 851 So.2d 921, cert denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in La. C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La. 2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La. 10/4/96), 680 So.2d 1165. On appeal, a reviewing court must view the evidence in the light most favorable to the prosecution and must presume in support of the judgment of the existence of every fact the trier of fact could reasonably deduce from the evidence.

Jackson, supra.

The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442. |,SA reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2d Cir. 2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La. 12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App. 2d Cir. 5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La. 12/14/07), 970 So.2d 529.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La.App. 2d Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La. 11/6/09), 21 So.3d 299; State v. Allen, 36,180 (La.App. 2d Cir. 9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La. 3/28/03), 840 So.2d 566, 2002-2997 (La. 6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict-with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App. 2d Cir. 2/13/08), 975 So.2d 753; State v. Burd, 40,-480 (La.App. 2d Cir. 1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La. 11/9/06), 941 So.2d 35.
In a sexual assault case, the testimony of the victim alone is sufficient to convince a reasonable fact-finder of a defendant’s guilt beyond a reasonable doubt. State v. Rives, 407 So.2d 1195 (La. 1981); State v. Wade, 39,797 (La.App. 2d Cir. 8/9/05), 908 So.2d 1220; State v. Elzie, 37,-920 (La.App. 2d Cir. 1/28/04), 865 So.2d 248, writ denied, 2004-2289 (La. 2/4/05), 893 So.2d 83. Furthermore, such testimony alone is sufficient, even where the state does not introduce medical, scientific or physical evidence to |14prove the commission of the offense by the defendant. State v. Wade, supra.

Aggravated Rape

Effective in 2001 through 2003,[10] La.R.S. 14:42 defined the crime of aggravated *978 rape[11] as follows:
Aggravated rape is a rape .., where the anal, oral, or .vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstance?:
[[Image here]]
(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim’s age shall not be a defense.
***
D. (1) Whoever commits the crime of aggravated rape shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
In the instant case, the evidence established that J,B. was under the age of 13 years when the aggravated rape occurred. In his statement to Investigator Vallery, J.B. stated that he was between the ages of “eight and ten” when the defendant performed oral sex on him. However, during the trial, J.B, testified that he was ten-years old at the time. Although J.B. admitted that he provided Investigator Vallery with a range for his age when the rape occurred, at trial, he explained that he remembered that, he was in 11Bthe fifth grade and he had to attend Mangham Elementary School the following day. Additionally, J.B. specifically recalled being awakened during the night to find the defendant performing oral sex on him. Although the incident occurred during the night, he testified that light was coming in through the window, and he was able to see the defendant, not Timothy, perfornl-ing the act. J.B. admitted that he did not tell anyone about the incident because he was “too embarrassed” to do so. Further, he testified that the statements he made to the investigator were truthful.
It is clear from the verdict that the jury believed and found credible J.B.’s testimony. Consequently, after viewing the evidence in the light most favorable to the prosecution, J.B,’s testimony that the defendant performed oral sex on him when he was 10 years old was sufficient to prove that the defendant, who would have-been 20 or 21 years old at that time, committed the offense of aggravated rape. This assignment lacks merit.

Indecent Behavior with a J.uvenile

La. R.S. 14:81 provides:
A. Indecent behavior with juveniles is the commission of any of the following acts with the intention of arousing or gratifying the sexual desires of either person:
(1) Any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where- there is an age difference of greater than two. years between the two persons. Lack of knowledge of the child’s age shall not be a defense.
[[Image here]]
H. (1) Whoever commits the crime of ■indecent behavior with juveniles shall be fined not more than five thousand dol- ■ lars, or imprisoned with or without hard labor for not more than seven years, or both[.]
*979 hair! the instant case, the state’s evidence established that at the time of the offenses, C.B. was 16 years old, and the defendant was 31 years old. Therefore, the evidence established that at the time of the offenses, C.B. was “under the age of seventeen” and there was “an age difference of greater than two years” between the defendant and C.B.
.Moreover, C.B. unequivocally testified at trial that he and the defendant engaged in oral sexual intercourse on two occasions in 2013. C.B. stated that one of the incidents occurred at his father’s home, where the defendant lived at the time; the other incident occurred at the mobile home where he lived with his mother, stepfather and siblings. According to C.B., the defendant also masturbated in his presence. O.B.’s testimony, alone, was sufficient to support the defendant’s conviction for indecent behavior with a juvenile. The jury reasonably accepted C.B.’s trial testimony as credible, and overlooked the minor inconsistencies in this testimony and in the statements he provided to Investigator Vallery.[12] Further, it is evident that the jury rejected the defense’s attempt to attack C.B.’s credibility through the testimony of his father, S.B. and A.B., As stated above, the jury’s assessment of credibility is entitled to great weight. Viewing the evidence in' a light most favorable to the prosecution, we find that the evidence is sufficient to support the defendant’s conviction of the offense of indecent behavior with a juvenile. This assignment lacks merit.
| i7Pro Se Assignment—Batson Challenges
The defendant contends the trial court erred in denying his challenges pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). He argues that the state improperly utilized peremptory challenges to strike three prospective African-American jurors on the basis of their race.
It.is well settled that.the use of peremptory challenges based solely on a juror’s race is prohibited. Batson, supra.[13] In Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006), the Court described the three-step Batson process as follows:
A defendant’s Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation . for striking the juror in question. Although the prosecutor must present a comprehensible, reason, the second step of this .process does not demand an explanation that is . persuasive, or even plausible; so long as the reason is not . inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried, his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.
*980 546 U.S. at 338, 126 S.Ct. 969 (internal quotations and citations omitted).
Thus, to establish a prima fa-cie case, the objecting party must show: (1) the striking party’s challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) Irrelevant circumstances sufficient to raise an inference that the peremptory challenge was used to strike the venireperson on account of his or her being a member of that cognizable group. If the trial court determines the opponent failed to establish the threshold requirement of a prima facie case (step one), then the analysis is at an end and the burden never shifts to the proponent of the strike to articulate neutral reasons (step two). State v. Nelson, 2010-1724 (La. 3/13/12), 85 So.3d 21.
In State v. Green, 94-0887 (La. 5/22/95), 655 So.2d 272, the Court outlined the following multifactor approach for determining whether a prima facie case has been made:
The defendant may offer any facts relevant to the question of the prosecutor’s discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination. •
655 So.2d at 287-88.
No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination. A trial judge may take into account not only whether a pattern of strikes against African-American venirepersons has emerged during voir dire, but also whether the prosecutor’s questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. State v. Jacobs, 1999-0991 (La. 5/15/01), 803 So.2d 933, cert. denied, 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002). Batson accords the trial court considerable flexibility and broad discretion in this regard because “trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor’s use of peremptory challenges create a pri-ma facie case of discrimination against black jurors.” Batson, 106 S.Ct. at 1723; State v. Jacobs, supra.
The trial court plays a unique role in the dynamics of voir dire, for it is the court that observes firsthand the demeanor of the attorneys and the venireper-sons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. See State v. Jones, 42,531 (La. App. 2d Cir. 11/7/07), 968 So.2d 1247. The trial court’s determination that the defense has failed to set forth a prima facie case of purposeful discrimination merits great deference on appeal. State v. Tucker, 591 So.2d 1208 (La.App. 2d Cir. 1991), writ denied, 594 So.2d 1317 (La. 1992).
In the instant case, the prosecution utilized peremptory strikes to strike three African-American prospective jurors, Anthony Abraham, Dwayne Nash and Shirley Williams. Thereafter, defense counsel lodged a Batson challenge, and the prosecutor argued that the defense had failed to establish a prima facie case of racial discrimination.

*981
Anthony Abraham

During the state’s examination of Abraham, he stated that he understood the law and he would be able to remain impartial and follow the law. However, some of Abraham’s responses during the defendant’s examination were problematic. The colloquy was as follows:
[Defense Counsel]: [W]henever ' you see—see in aj^newspaper *** you see all these lovely mug shots and you see these names, do you always think they must have done something?
A: Yes, ma’am.
[[Image here]]
[Defense Counsel]: [D]o you think my client has to prove he’s innocent[?] ***[D]o you want to hear his side of the story?
A: Yes, ma’am.
[Defense Counsel]: Do you think that— that he should have to put on some evidence?
A: Yes, ma’am.
[Defense Counsel]: [D]o you think it’s fair that *** the burden is completely on the State to prove the claim[.] *** [Y]ou heard [the prosecutor] say that [the defendant] doesn’t have to put on any evidence and that [the state] has the burden to prove that anything occurred. Do you think that’s fair?
A: I really don’t.
[Defense Counsel]: You don’t know?
A: No.
[[Image here]]
[Defense Counsel]: Given how people feel about crimes against juveniles do you think he’s already got a strike against him?
A: Yes.
⅜⅜$
[Defense Counsel]: [I]f they say, ‘You’ve got to vote guilty or not guilty on [the defendant],” how would you vote right now?
A: I guess guilty.
⅜⅜⅜
Thereafter, on redirect examination, Abraham stated that he had not made up his mind with regard to the defendant’s guilt or innocence. He reiterated that he understood that the defendant had “a constitutional right not to say anything, not to put on any witnesses” and that he would be able | ⅞1 to follow the law.

Dwayne Daniel Nash

During voir dire, Nash stated that he was a former special education paraprofessional. He also stated that he would be a fair and impartial juror and would be able to follow the law. Both state and defense utilized peremptory challenges to strike Nash. The state did not provide a reason for challenging Nash. However, defense counsel stated that Nash was challenged because he “is in special education. You’ve got one victim who is, you know, the claim is he’s slower than anybody else.”[14]

Shirley Kaye Williams

During voir dire, Williams expressed that she did not want to serve on the jury because of her responsibilities at her job. She stated that she would not be a fair and impartial juror because “I don’t want to be here and I don’t want to judge this young man. I’m not God.”[15]
*982 | ¡^Following a bench conference, the trial court stated, “All right Ms. Williams, you can go back to the—to work.” Defense counsel objected “for Batson grounds.” Thereafter, the following discussion took place:
[Court]: [I] think there was an objection on the basis of Batson, so do you want to argue that or ...
[Defense Counsel]: Yes, Your Honor, at this point we show a prima facie case of Batson, The three peremptory challenges by the State were black minorities and based on that we thought it would be prudent to enter a Batson objection.
[Prosecutor]: Well, no—no, that’s not a prima facie showing, they’ve got to show a prima facie showing, we shouldn’t—you can’t stand up there, you excused three black people. It’s not a
[[Image here]]
[[Image here]]
[Defense Counsel]: That’s a pattern.
[[Image here]]
[Prosecutor]: *** Mr. Abraham was sleeping half—through half our jury voir dire, he—on the stand, he had difficulty even answering questions, he answered questions that were contrary to what the' law says and I—and I’m asking questions he’s asleep *** he wasn’t just dozing, he was sound asleep, so he’s not paying attention to the jury proceedings and then we have Mrs. Williams who just sat on the stand and said ‘I don’t want to be here, I’m not going to judge this young man I don’t want to be here in this Courtroom’ and her attitude, she—she may have been this close to being a cause case, so this is really a ridiculous motion, we shouldn’t even have to respond to, there’s certainly no prima facie showing[.]
[Court]: [T]hey did also excuse .Mr. Nash, which was a double, both of you did.
[Defense Counsel]: Yes.
Jig***
Thereafter, the trial court denied the defendant’s Batson objection, stating:
Mr. Nash—first of all Mr. Nash was excused by both[.] I believe first of all there’s blacks up, there’s been plenty of blacks that haven’t been excused. I think there—I do not believe there’s a prima facie case being shown. Also in addition, I believe that the’ State has provided race neutral reasons for the ones that were excused, even if there were a pri-ma facie case. So—so I deny the Batson challenge at this time[.]
At the time defense counsel lodged the Batson challenge, there were five African-American prospective jurors on the panel, all of whom ended up on the final jury. The final jury was composed of seven African-American jurors and five Caucasian jurors.
We have reviewed the voir dire record in its entirety. We find that the defendant failed to make a prima facie showing that the state exercised a peremp *983 tory challenge to exclude Abraham on the basis of race. The defense made no effort to show that Abraham was challenged solely based on his race. Nevertheless, the state presented a race-neutral reason for challenging Abraham. Abraham’s responses to questions during voir dire indicated that he was reluctant to follow the' law. Further, the state pointed out that Abraham was asleep during most of the voir dire proceedings. We find no error in the trial court’s denial of the defendant’s Bat-son challenge with regard to Abraham.
Regarding Nash, we find that the defendant failed to make a- prima facie showing that the state exercised a peremptory strike on the basis of race. As noted above, the defendant provided his own race-neutral reason for utilizing a peremptory challenge to strike Nash from the jury panel.
Further, we find that the defendant did not make a prima facie | ¡^showing that the state utilized a peremptory challenge to strike Williams on the basis of her race. The defense made no effort to show purposeful discrimination on the part of the state. The prosecutor explained that he challenged Williams because she indicated that she was preoccupied with her job responsibilities and she expressed a reluctance to “judge” the defendant.
The trial court’s ruling denying the defendant’s Batson challenge is entitled to great deference and is supported by this record. Thé record reveals that the state’s questioning of the prospective jurors was not improper or focused on racial factors. The three peremptory challenges were against African-American prospective jurors. However, as noted above, five African-American prospective jurors remained on the panel and were all ultimately selected to serve on a jury which contained seven African-American jurors. This assignment lacks merit.

Pro Se—Non-Unanimous Verdict

The defendant contends the trial court erred in permitting a non-unanimous ■ verdict for his conviction of aggravated rape. He argues that the life sentence he received for that conviction is likened to a “death penalty,” and therefore, he was entitled to a unanimous verdict.
La. C.Cr.P. art. 782 provides for the number of jurors composing a jury, and the number which must concur in rendering the verdict. That article provides, in pertinent part:
A. Cases in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict[.]
Ja***
Aggravated rape is an offense for which “punishment is necessarily confinement at hard labor.” See La. R.S. 14:42(D)(1).[16]
Although the defendant did not expressly challenge the constitutionality of La. C.Cr.P. art. 782, Louisiana courts have consistently upheld the constitutionality of that article.[17] In State v. Bertrand, 2008- *984 2215 (La. 3/17/09), 6 So.3d 738, the Louisiana Supreme Court stated:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments.
Id. at 743. See also, Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972).
After, reviewing the statutory law and the state and federal jurisprudence, we find that the defendant’s conviction for aggravated rape by a vote of 11-1 was permissible under our federal and state constitutions. This assignment of error lacks merit.

19RPro Se—Bill of Particulars

The defendant contends the trial court erred in allowing the state to supplement the bill of particulars on the day of trial. He argues that the state should not have been permitted to change the time frame alleged for the aggravated rape of J.B. so close to trial and that the “wide date range” made it impossible for the defense to adequately prepare for trial.
The court, on its own motion or on the motion of the defendant, may require the district attorney to furnish a bill of particulars setting forth more specifically the nature and cause of the charge against the defendant. La. C.Cr. P. art. 484. The function of a bill of particulars is to inform the accused of matters, pertinent to the charge, which the trial court in its sound discretion considers necessary, in fairness, to permit the accused to defend himself. State v. Harris, 627 So.2d 788 (La.App. 2d Cir. 1993), writ denied, 93-3188 (La. 3/18/94), 634 So.2d 851. A trial court is vested with wide discretion in determining the sufficiency of the state’s answers to bills of particulars, and its ruling will not be disturbed unless a clear abuse of that discretion is shown. State v. Shields, 32,715 (La.App. 2d Cir. 5/27/99), 760 So.2d 353; State v. Harris, supra.
In State v. Shields, supra, the defendant was charged by bill of indictment with the aggravated rape of his stepdaughter. The bill of indictment alleged that the multiple rapes occurred “from February, 1994, through December, 1995.” The defendant filed a motion to quash the indictment, contending the indictment failed to allege more specific times, dates and locations of the alleged offenses. The state responded by arguing that it was unable to provide more specificity because the young victim recalled being “between six and seven years old” when the offensesj^occurred. The trial court denied the defendant’s motion and this Court denied the defendant’s application for supervisory writs, stating:
The victim could not name specific dates and times when the defendant raped her; however, she could and did give “time frames” within which the rapes occurred. Those time frames were within the time frame alleged in the indictment. Under these circumstances, the time frame stated in the indictment is *985 specific enough to allow defendant to adequately prepare his defense.
Id. at 354 (internal citation omitted).
In the instant case, the original bill of indictment alleged that the defendant committed the aggravated rape of J.B. between the dates of January 1, 2000 and December 31, 2003. On November 23, 2015, the defendant filed a motion for a bill of particulars, requesting that the state provide, inter alia, “the date and time it is contended that the defendant committed the offense charged.” On December 11, 2015, the state responded to the defendant’s motion for a bill of particulars, asserting that the rape of J.B. “occurred between the dates of July 10, 2001 and July 9, 2003.” The defendant objected to the state’s response, arguing that the response was insufficient and the wide time frame of each charge did not allow the defendant to prepare a proper defense. At the defendant’s request, the trial court ordered the state to file another response which provided a more specific date range.
On December 14, 2015, the state filed another response to the defendant’s motion for a bill of particulars, alleging that the rape occurred “between the dates of August 20, 2001 and May 22, 2003.” The trial court heard arguments on the defendant’s objection to the state’s response to the bill of particulars. The state argued that it was unable to prove, with more 12Sspecificity, the date the rape occurred. The prosecutor explained that he visited the Richland Parish School Board office to “narrow down” the dates when the aggravated rape could have occurred (when J.B. would have been in the fifth grade). Defense counsel asserted that the date range was “too broad” and did not allow the defense to properly prepare for trial. The trial court ruled that the state’s response to the motion for a bill of particulars was sufficient, given that the offense occurred “a long time ago” and the state had narrowed the time frame from a period of three years to a period of less than two years. Thereafter, the trial court permitted the state to amend the indictment to allege that the rape occurred between the dates of August 20, 2001 and May 22, 2003.
On appeal, the defendant argues that the state should not have been permitted to amend the time frame alleged for the aggravated rape. The defendant notes that La. R.S. 14:42 was amended, effective August 15, 2001, to redefine aggravated rape as including oral sexual intercourse. The defendant also notes that the amendment to the statute took effect five days before the new time range alleged in the state’s December 14,2015 response.
We find that the trial court did not abuse its discretion by denying the defendant’s request to have the state specify, in more detail, the date when the aggravated rape of J.B. occurred. As in the case of most young victims of rape, J.B. was unable to name a specific date and time when the defendant raped him. However, he was able to provide a time frame within which the rape occurred. J.B. testified that the aggravated rape occurred when he was about 10 years old, in the fifth grade and attending Mangham Elementary School. The state utilized the information obtained from J.B., and the | ^information provided by the Richland Parish School Board, to provide the defendant with the most specific time range available for the aggravated rape. Additionally, throughout the proceedings, the defendant was aware that J.B. had stated that the rape occurred when he was “10 years old.” We find that the time frame provided by J.B. was specific enough to allow the defendant to adequately prepare his defense. Therefore, the defendant cannot now assert that he was in any way “surprised” by the bill of particulars or by *986 J.B.’s testimony at trial. Consequently, we find no error in the trial court’s denial of the defendant’s motion for a bill of- particulars .regarding the exact dates and times the crimes allegedly occurred. This assignment lacks merit, ■

Pro Se—Other Crimes Evidence

The defendant contends the trial court erred in allowing the state to introduce evidence of his 2000 and 2007 convictions for carnal knowledge of a juvenile.. He argues that his prior convictions were based on “consensual acts” and had no relevance to his charges for aggravated rape and indecent behavior with a juvenile. Further, the defendant asserts that evidence of his prior convictions should have been excluded because its probative value was far outweighed by its prejudicial effect.
Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him as a “bad person.” La. C.E. art. 404(B); State v. Jackson, 625 So.2d 146 (La. 1993); State v. Dale, 50,195 (La.App. 2d Cir. 11/18/15), 180 So.3d 528. However, La. C.E. art. 412.2 allows the admission of evidence of other similar crimes when the victim in the case at issue is a. child under the age of 17. State v. Dale, supra; State v. Zornes, 34,070 (La.App. 2d Cir. 4/3/02), 814 So.2d 113, writ denied, 2002-1280 (La. 11/27/02), 831 So.2d 269.
La. C.E. art. 412.2 provides, in pertinent part:
A. When- an accused is charged with a crime involving ... acts that constitute .a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or ... acts which indicate a lustful disposition toward children may be admissible and may be considered for its bearing on any matter to which.it is relevant[.]
[[Image here]]
It is not necessary, for purposes of Art. 412.2 testimony, for the defendant to have been charged, prosecuted, or convicted of the “other acts” described. State v. Layton, 2014-1910 (La. 3/17/15), 168 So.3d 358; State v. Dale, supra. The admissibility of such statements under La. C.E. art. 412.2 is dependent on whether the probative value of the statements substantially outweighs the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or waste of time. La. C.E. art. 403; State v. Dale, supra.
A trial court’s ruling on the admissibility of such evidence will not be overturned absent an abuse of discretion. State v. Dale, supra; State v. Preston, 47,273 (La.App. 2d Cir. 8/8/12), 103 So.3d 525. Even if an appellate court determines that the trial court abused its discretion in admitting evidence under La. C.E. art. 412.2, such an introduction is subject to harmless error analysis on appeal. State v. Dale, supra; State v. Parker, 42,311 (La.App. 2d Cir. 8/15/07), 963 So.2d 497, writ denied, 2007-2053 (La. 3/7/08), 977 So.2d 896.
 As stated above, the defendant specifically moved to exclude evidence |31 of his 2000 and 2007 convictions for carnal knowledge of a juvenile. According to the defendant, the 2000 conviction resulted from a consensual sexual relationship with his girlfriend when he and the victim were both teenagers. He also argued that the facts of his 2007 conviction were dissimilar to this case because that case involved a 15-year-old girl, rather than a 10-year-old boy and a 15-year-old boy.
*987 After review, we conclude that the trial court’s decision to admit evidence of the defendant’s prior convictions for carnal knowledge of a juvenile did not constitute an abuse of discretion. As the trial court noted, evidence of the defendant’s prior acts was admissible to show his “lustful disposition toward children.” La. C.E. art. 412.2. This assignment lacks merit.

Pro Se—“Improper” Indictment

The defendant further contends his grand jury indictment was “improperly titled ‘Agg. Rape.’” He argues that the indictment should have been entitled “La. R.S. 14:43.4 ‘Agg. Oral Sexual Battery.’” Citing State v. Quang T. Do, 13-290 (La.App. 5 Cir. 11/19/13), 130 So.3d 377, writ denied, 2013-2907 (La. 6/20/14), 141 So.3d 285, the defendant maintains that the time frames noted in the grand jury indictment of aggravated rape “begin before and after” La. R.S. 14:43.4 was repealed.[18]
The facts of this case are distinguishable from the facts of State v. Quang T. Do, supra. The defendant herein was not charged with, or | ¡^convicted of, any crime pursuant to La. R.S. 14:43.1, The complained of charge and conviction, aggravated rape, was pursuant to La. R.S. 14:42. Although the statute has been amended on multiple occasions,[19] it has not been repealed. As discussed above, during the relevant dates contained in the indictment— between August 20, 2001 and May 22, 2003—La. R.S. 14:42 defined aggravated rape to include oral intercourse committed against a child under the age of thirteen. This assignment lacks merit.
ERROR PATENT
In accordance with La.' C.Cr.P. art 920, this Court has thoroughly reviewed this record for errors patent. We have found two errors patent in these proceedings.
Aggravated rape and indecent behavior with juveniles are sex offenses defined by La. R.S. 15:541, and La. R.S. 15:542 provides registration requirements for sex offenders. La. R.S. .15:543 requires the trial court to notify a defendant charged with a sex offense, in writing, of the registration requirements. The statute also requires that such notice be included on any guilty plea forms, judgments and sentence forms provided to the defendant, and that an entry be made in the court minutes confirming the written notifica tion. This record .does not show that.the trial court provided the defendant with verbal or .written notice of his obligation to register as a sex offender. Therefore, we hereby remand this matter to the trial court for the purpose of providing the appropriate written notice ..to the defendant of the sex offender registration requirements. State v. Williams, 49,249 (La.App. 2d Cir. 10/1/14), 149 So.3d 462, writ denied, 2014-2130 (La. 5/22/15), 173 So.3d 1167; State v. Hough, 47,308 (La.App. 2d Cir. 8/1/12), 103 So.3d 477, writ denied, 2012-1936 (La. 3/8/13), 109 So.3d 357.
Additionally, the trial court did not properly advise the defendant with regard to the time limitations for filing an *988 application for post-conviction relief. Specifically, the trial court informed the defendant that he had “two years from the date this sentence is imposed” to file for post-conviction relief. The failure to properly advise a defendant regarding his right to post-conviction relief is not grounds to vacate the sentence and remand for resen-tencing. State v. Cooper, 31,118 (La.App. 2d Cir. 9/23/98), 718 So.2d 1063, writ denied, 99-0187 (La. 5/14/99), 741 So.2d 663. Accordingly, we hereby notify the defendant that he has two years, from the date his convictions and sentences become final under La. C.Cr.P. arts. 914 or 922, to file any applications for post-conviction relief. State v. Parker, 49,009 (La.App. 2d Cir. 5/15/14), 141 So.3d 839.
CONCLUSION
For the reasons set forth herein, we affirm the defendant’s convictions and sentences. We remand this matter to the trial court with instructions to provide the defendant with the appropriate notice with regard to the sex offender registration requirements.
CONVICTIONS AFFIRMED; SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.

. The victims in this matter will be referred to by their initials for confidentiality purposes in accordance with Da. R.S.46:1844(W). Additionally, when possible, the relatives, whose identities could aid in the identification of the victims, will be referred to either by their initials or by their relation to the victims.

. J.W.B, is the father of tire defendant and C.B. The defendant and C.B. have different " mothers. J.W.B. and C.B's mother, R.M., are divorced. After the divorce, R.M. and C.B. moved into a mobile home located on the same property as J.W.B's residence.

. The defendant’s date of birth is November 24, 1982; he was 30 years old at the time of the offenses regarding C.B., and 20 or 21 years old at the time of the offense regarding J.B.

. The defendant had been incarcerated after being convicted of carnal knowledge of a juvenile regarding his 15 year-old female cousin.

. On February 16, 2016, Timothy Berry, the defendant’s brother and C.B.’s half-brother, was convicted of two counts of sexual battery with regard to C.B., and one count of sexual *972 battery regarding J.B. Timothy's arrest and subsequent conviction are not at issue in this appeal.

. J.B.’s response to C.B.’s question was illegible on the copy introduced into the record at trial.

. During the trial, it was revealed that J.B. was present in the motel room when the defendant engaged in "consensual sex” with the 15 year-old female cousin in 2007. It was from that incident that the defendant was convicted and sentenced in 2008.

. Becky Free, an employee of the Richland Parish School Board, testified as follows: in 2002, a student entering the fifth grade would , have started school on August 19, 2002; if "something happened” to a student during that school-year, the event would have occurred between August 19, 2002 and May 23, 2003; and if "something happened” to a student who was nine years old and in the fourth grade, the incident would have occurred between August 20, 2001 and May 23, 2002.
On cross-examination, Free testified that she did not have any personal knowledge about anything that happened to J.B. during the 2001-2002 school-year or the 2002-2003 school-year. She also testified that she did not have any personal knowledge of any of the allegations made against the defendant.

. The following colloquy occurred:
Q. And you were asleep, middle' of the night ■ and you woke up to somebody **⅜ messing with you? So how are you sure that this instance that you’re saying was [the defendant], was not Timothy? If both of them did the same exact thing to you— and you’re not even sure Timothy—Timothy might have even been [in the house] that night. How in the world can you sit here and say for sure beyond a reasonable doubt that was [the defendant]?
A. Well we weren’t—we [were] raised kind of poor, we didn’t have [any] curtains or [anything] on the windows, you could •see and there wasn't—it wasn’t just pitch black dark. There was enough light in there to see who—who it was.
Q. ***lf you can’t recall even the year it happened, if you cannot recall a season, how do you know if the moon was shining, or it was a cloudy night?
A. You can remember a face of someone doing that to you.
[[Image here]]
Q. So basically what you’re s.aying is that this person who you say was [the defendant], even though you think Timothy may have even been [in the house] that night, just came in in the middle of the night basically you woke up—he’s on— giving you oral sex? . .
A. Uh huh (yes).
Q. And then [did] that without saying a word?
A. Yes.
[[Image here]]

. Effective August 15, 2003, La. R.S. 14:42 was amended to define aggravated rape as the *978 rape of a child under the age of 13. See Acts 2003, No. 79S, § 1.

. "Aggravated rape” is now "first degree rape.” La. R.S. 14:42(E) provides:
For all purposes, "aggravated rape” and "first degree rape” mean the offense defined by the provisions of this Section and any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape, Any act in violation of the provisions of this Section committed oh or after August 1, 2015, shall be referred to as “first degree rape.”

. During the trial, defense counsel pointed out inconsistencies in C.B.’s statements to Investigator Vallery and his testimony at trial. Notably, C.B. initially stated that the first incident occurred at his home, and the second incident occurred at his father’s home. Additionally, defense counsel pointed out that C.B. had reported three incidents with the defendant. However, during his testimony, C.B. explained that during the interview with investigator Vallery, he was describing incidents involving the defendant and Timothy.

. The Batson ruling has been codified in La. ' C.Cr.P: art, 795.

. During the trial, C.B. was described as "special.”

. The dialog with regard to Williams was as follows:
[Prosecutor]: [Y]ou were working this week?
A: Uh huh (yes).
*#⅜
[Prosecutor]: Do you have somebody to handle the lunch room while you're out?
A: No. *** There’s not but two people—so I'm missing that right now. *** And we *982 have a, hundred and eight kids[.] I peed to get to them. ■
[[Image here]]
[Prosecutor]: Okay. Can you think of a reason why you couldn’t be fair and impartial to the State and the defense?
A: Yes, because I don’t want to be here and I don’t want to judge this young man, I’m not God. I have children myself and I just don’t want that on my shoulders.
[[Image here]]
[Prosecptor]: I’m asking you—you to act as a juror, your only job is to judge facts.
A: Uh huh (yes). I don’t want to do that.
[Prosecutor]: You don’t want to judge the facts and determine if somebody... ■
A: No.
[[Image here]]

. At the time the defendant committed the aggravated rape of J.B., La. R.S. 14:42 permitted the state to seek the death penalty for the offense of the aggravated rape of a child under the age of 13. However, in Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008), the'United States Supreme Court held that "a death sentence for one who raped, but did not kill, a child, and who did not intend to assist another in killing the child, is unconstitutional under the Eighth and Fourteenth Amendments.” 554 U.S. at 421, 128 S.Ct. 2641.

. See, State v. Jones, 381 So.2d 416 (La. 1980); State v. Edwards, 420 So.2d 663 (La. 1982); State v. Simmons, 414 So.2d 705 (La. *984 1982); State v. Bertrand, 2008-2215 (La. 3/17/09), 6 So.3d 738; State v. Mosley, 46,756 (La.App. 2d Cir. 12/16/11), 80 So.3d 1164, writ denied, 2012-0117 (La. 5/4/12), 88 So.3d 462; State v. Divers, 38,524 (La.App. 2d Cir. 11/23/04), 889 So.2d 335, writ denied, 2004-3186 (La. 4/8/05), 899 So.2d 2, cert. denied, 546 U.S. 939, 126 S.Ct. 431, 163 L.Ed.2d 327 (2005).

. In State v. Quang T. Do, supra, the defendant was charged by bill of indictment with eight various sex crimes, including aggravated oral sexual battery. Following a trial, he was convicted as charged. On appeal, the defendant'argued/ inter alia, that the law 'did not authorize his conviction for aggravated oral sexual battery because La. R.S. 14:43.1 had been repealed for part of the time period during which the state alleged that he committed that crime.

. As noted above, effective August 15, 2001, La. R.S, 14:42 was amended to redefine aggravated rape to include oral sexual intercourse, Effective August 15, 2003, the statute was amended to define aggravated rape as the rape of a child under the age of 13.