GASKINS (Pro Tempore ), J.
Following a jury trial, the defendant, Navarius Simon, was found guilty as charged of possession of marijuana with intent to distribute. Simon was sentenced to imprisonment at hard labor for 20 *1153 years, to run consecutively with his prior sentences for two drug offenses. Simon appeals his conviction and sentence. We affirm both.
FACTS
On June 8, 2016, Donna Richardson, Simon's parole officer, paid a visit to Simon's home, located at 400 Topeka Street in Mansfield, Louisiana. Richardson testified that when she pulled up to the home, Simon, who was outside washing his carport, noticed her and began walking into the house. Richardson asked him to stop, but when he continued, she followed him into the home. They immediately stopped in the kitchen area, where she noticed what appeared to be a small amount of loose marijuana on the kitchen table, along with some sandwich bags. After she asked Simon what the substance was, he admitted that it was indeed marijuana. Later, when she asked Simon why he had not stopped, he answered that he knew the marijuana was on the table.
Richardson placed Simon under arrest and called for backup to search the house because Sharice Powell, Simon's girlfriend; Terrance Lane, his cousin; and Khadijah Cotton, Lane's girlfriend, were also present. Law enforcement officers, including Sgt. Justin Taylor and Lt. Chato Atkins, both with the Desoto Parish Sheriff's Office, responded. Taylor was a narcotics investigator, and Atkins was a supervisor of the narcotics agents.
Richardson searched Simon's bedroom, where she found loose money on a dresser. Under his bed, the officers found two boxes full of money in sandwich bags. The money, which totaled approximately $7,000, was mostly in small bills, separated by denomination into bags.
Next to Simon's bedroom was his cousin's bedroom. A red first aid bag containing marijuana was found inside a dresser drawer in this bedroom. On the bedroom floor was a Crown Royal bag, also containing marijuana. Some of the marijuana had been packaged into little plastic bags.
During the search of the home, the officer also discovered 1.2 pounds of marijuana in a shopping bag atop clothes in a laundry basket in front of a washer or dryer that was located in the combined laundry/kitchen area of the house.
Powell, Lane, and Cotton were arrested with Simon. All four were charged with possession of marijuana with intent to distribute, in violation of La. R.S. 40:966(A)(1).
Officer Richardson, Lt. Atkins, and Sgt. Taylor testified at trial about what took place at Simon's home on the date of his arrest. The officers also identified exhibits containing the marijuana found on the kitchen table, the first aid bag, the Crown Royal bag, the plastic bags that contained the cash found under Simon's bed, the 1.2 pounds of marijuana found in the laundry basket, and the sample of marijuana sent to the lab for testing.
Officer Atkins testified that Simon reported he was not employed. The marijuana and the large amount of cash found in the house led Atkins to believe that Simon was selling marijuana.
Alanna Brauer, a forensic chemist with the North Louisiana Crime Lab, was accepted as an expert in forensic chemistry. She testified that the samples from the drugs recovered from Simon's house tested positive for marijuana.
Carl Townley was tendered and accepted as an expert in narcotics investigation, packaging, use and sales, and simple possession versus possession with intent to distribute. Townley retired from the Caddo Parish Sheriff's Office after 32 years, with 27 years served in the narcotics division and in the street level interdiction unit. Townley testified that certain elements *1154 serve as indicators of whether someone is a drug user or a drug seller, including the drug packaging, the amount of drugs, the amount and denomination of currency found, and the presence or absence of personal smoking paraphernalia.
Having reviewed the police reports, Townley noted that officers searching Simon's home found a total of 694 grams, or approximately 1.5 pounds of marijuana, some of it separated into sandwich bags, and over $7,000 in small bills, separated into sandwich bags. The officers did not find any smoking devices that would indicate the marijuana was for personal use.
In Townley's opinion, a normal user would smoke one-half to one gram of marijuana a day, whereas a heavy user might smoke up to three grams. Based on these figures, Townley believed that the amount of marijuana recovered from Simon's home would last a normal user for two years. However, Townley commented that due to the limited shelf life of marijuana, it would dry out and would lose its potency if stored in plastic bags.
Townley agreed that the small amount of marijuana found on the kitchen table, by itself, might be for personal use. However, in Townley's expert opinion, the total amount of marijuana and cash found indicated that the marijuana was intended for sale rather than just personal use. Townley also testified that it was not uncommon to find multiple persons selling marijuana from one location. Townley further explained that it was not uncommon for officers to find that the marijuana was kept separate from the cash, and that this setup could indicate distribution. Townley estimated that the retail value of the marijuana was $10 per gram, or almost $7,000 for the total amount.
After the state rested, the defense called Terrance Lane, Smith's cousin. Lane testified that he also lived at 400 Topeka Street, and he was there on June 8, 2016, with his girlfriend, the defendant, and Simon's girlfriend, Sharice Powell. Lane confirmed that he was awakened around 9:40 a.m. by the officers and that he was handcuffed while they searched the house. He was later arrested and charged with possession of marijuana with intent to distribute. Lane pled guilty and was sentenced to seven years at hard labor, suspended, and four years of supervised probation.
Lane stated that he and Powell purchased over two pounds of marijuana to smoke with friends at a gathering they were planning, that the marijuana belonged to him and Powell, and that Simon knew nothing about the marijuana. Lane said that they did not tell Simon about purchasing the marijuana because he would be mad since Simon was still on parole. Lane testified that he purchased the marijuana from an unknown male who called Lane as he was traveling through the area.
Lane insisted that he did not have any partnership with Simon and that he was not selling the marijuana. When asked about the packages of marijuana found in his room, Lane admitted that he would sell some of the marijuana found in his room if someone was interested.[1]
Lane testified that he knew nothing about the money found in Simon's bedroom and insisted that the money was not proceeds from selling the marijuana. Lane confirmed that he earned money working at a pecan plant and stacking bricks. Lane also testified that Simon did not have a job, but he thought Simon did a little work at the pecan plant.
*1155 Sharice Powell was called as a witness on behalf of Simon. She testified that she had been with Simon for three years and that she lived with him at 400 Topeka Street. Powell stated that she had been arrested and charged with possession with intent to distribute. Like Lane, Powell swore that Simon knew nothing about the marijuana that she and Lane purchased to share with friends at a gathering.
Powell testified that she and Lane each contributed $300 to purchase two pounds of marijuana. She insisted that neither she, nor Lane, sold marijuana, and she stated that she worked at McDonald's. Powell testified that the marijuana in the laundry basket was in a shopping bag and was covered with clothes. Powell explained that the money found underneath Simon's bed came from an auto accident settlement and that he used it to loan money to others. Powell denied knowing about the marijuana found in Lane's bedroom.
The jury returned a verdict of guilty as charged of possession with intent to distribute marijuana.
The trial judge ordered a presentence investigation report and scheduled sentencing. Simon appeared for sentencing on April 6, 2017. The trial judge confirmed that both sides had reviewed the PSI report and had no objections.
The trial judge noted that the instant conviction is Simon's third conviction for possession with intent to distribute, with the first conviction in 2006 and the second in 2007. Simon was still on probation for the 2006 conviction when he committed the second offense in 2007 and his probation was revoked. Simon had been released on good-time parole supervision on February 14, 2013, for the drug convictions. The trial judge further observed that Simon was arrested in 2013 for unlawful presence of a sex offender and was sentenced to 120 days in parish jail. The trial judge noted that Simon was still on parole at the time he committed the instant offense.
The trial judge informed Simon that he faced a potential sentencing range of 5-30 years at hard labor. Having considered Simon's criminal history, the trial judge found that Simon had no intention of changing his criminal ways. Simon was sentenced to 20 years at hard labor, to run consecutively to his remaining sentences for the two prior drug convictions. Simon was given credit for time served and advised that he had two years from the date his conviction and sentence were final to seek post-conviction relief.
Simon, who did not file a motion to reconsider sentence, appealed his conviction and sentence.
DISCUSSION
Sufficiency of the evidence
Simon contends in his first assignment of error that there was insufficient evidence to prove beyond a reasonable doubt that he was guilty of possession of marijuana with intent to distribute.
Simon asserts that the state failed to prove that he was in actual or constructive possession of the marijuana because there was no evidence showing that he knew about any more than the small amount of marijuana found on the kitchen table, an amount consistent with personal use and not distribution. Simon points out that the state failed to show that he had dominion and control over the marijuana in the laundry basket or in Lane's room, or that he had actual knowledge of the marijuana in those locations.
Simon argues that both Lane and Powell admitted that they purchased the marijuana found in the laundry basket and in Lane's room, and that they did not tell Simon about it. Simon further maintains that, at most, he is guilty of only possession *1156 of the small amount of marijuana on the kitchen table. Accordingly, Simon contends that the evidence presented at trial was only sufficient to show that he possessed a small amount of marijuana and a large amount of cash, but insufficient to show that he was selling marijuana. Simon echoes Lane and Powell's assertions that the cash was from a settlement regarding an auto accident, even though he presented no evidence of this at trial.
The state argues that Simon demonstrated guilty knowledge by running back inside the house when his parole officer appeared and admitting that he did so because he knew the marijuana was on the kitchen table. The state contends that Simon had actual and constructive knowledge of the evidence of distribution because all of the marijuana was found in areas of his home where he had direct access-the kitchen, the laundry area, and the bedroom immediately adjacent to Simon's room. Furthermore, Simon had no job, yet he had approximately $7,000 in small bills stored in separate sandwich bags under his bed. The state asserts that the circumstantial evidence indicated that Simon was selling marijuana, and it was not for personal use, in light of the large amount found, some of which was individually packaged; the large amount of cash, also individually packaged; and the absence of personal use devices. Finally, the state maintains that the verdict suggests that the jury did not find Lane and Powell to be credible witnesses. The state argues, therefore, that the evidence was sufficient to support a conviction for possession of marijuana with intent to distribute.
In a reply brief, Simon contends that the state failed to provide direct evidence that he knew of the marijuana in the house other than the amount on the kitchen table, and absent that direct evidence, the issue of his knowledge about the other marijuana was not a credibility issue to be determined by the jury. Simon argues that the issue of whether he had constructive knowledge does not involve the weighing of evidence or a credibility determination.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So.2d 921. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason , 43,788 (La. App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied , 2009-0725 (La. 12/11/09), 23 So.3d 913, cert. denied , 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed. 2d 1068 (2010) ; State v. Hill , 42,025 (La. App. 2 Cir. 5/9/07), 956 So.2d 758, writ denied , 2007-1209 (La. 12/14/07), 970 So.2d 529.
Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. State v. Lilly , 468 So.2d 1154 (La. 1985). Circumstantial evidence provides proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. Id. When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. State v. Robinson , 47,437 (La. App. 2 Cir. 11/14/12), 106 So.3d 1028, writ denied , 2012-2658 (La. 5/17/13), 117 So.3d 918. The *1157 trier of fact is charged with weighing the credibility of this evidence, and on review, the Jackson standard is applied, giving great deference to the fact finder's conclusions. State v. Hill , 47,568 (La. App. 2 Cir. 9/26/12), 106 So.3d 617.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Glover , 47,311 (La. App. 2 Cir. 10/10/12), 106 So.3d 129, writ denied , 2012-2667 (La. 5/24/13), 116 So.3d 659 ; State v. Speed , 43,786 (La. App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied , 2009-0372 (La. 11/6/09), 21 So.3d 299. The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, the reviewing court may impinge on that discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
La. R.S. 40:966(A)(1) provides that it is unlawful for a person to possess with intent to distribute a controlled dangerous substance or controlled substance analogue classified in Schedule I, which includes marijuana.
To convict a defendant of possession of a controlled dangerous substance with intent to distribute, the state must prove beyond a reasonable doubt that he knowingly or intentionally possessed the contraband and that he did so with the intent to distribute it. State v. Howard , 49,965 (La.App. 2 Cir. 6/24/15), 169 So.3d 777, aff'd , 2015-1404 (La. 5/3/17), 226 So.3d 419 ; State v. Williams , 47,574 (La.App. 2d Cir. 11/14/12), 107 So.3d 763, writ denied , 2013-0079 (La. 6/14/13), 118 So.3d 1080.
Intent to distribute a controlled dangerous substance is a specific intent crime. State v. Credeur , 11-234 (La. App. 3 Cir. 11/23/11), 81 So.3d 741. Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1). As a state of mind, specific intent need not be proven as a fact, but may be inferred from the circumstances of the offense and the defendant's actions. State v. Thornton , 47,598 (La. App. 2 Cir. 3/13/13), 111 So.3d 1130. Intent to distribute illegal drugs may be established by proving circumstances surrounding the defendant's possession which give rise to reasonable inferences of intent to distribute. State v. Holden , 45,038 (La. App. 2 Cir. 1/27/10), 30 So.3d 1053, writ denied , 2010-0491 (La. 9/24/10), 45 So.3d 1072.
The state need not prove the defendant actually possessed the drugs, as evidence of constructive possession is sufficient. State v. Howard, supra ; State v. Holden, supra . Constructive possession is established by evidence that the drugs were within the defendant's dominion and control and that the defendant had knowledge of their presence. Id. Guilty knowledge is an essential element of the crime of possession of contraband, and such knowledge can be inferred from the circumstances. State v. Toups , 2001-1875 (La. 10/15/02), 833 So.2d 910 ; State v. Anderson , 36,969 (La. App. 2 Cir. 4/9/03), 842 So.2d 1222.
Factors to be considered in determining whether a defendant exercised dominion and control sufficient to constitute constructive possession include the defendant's knowledge that drugs were in the area, the defendant's relationship with other persons found in actual possession, the defendant's access to the area where the drugs were found, evidence of drug paraphernalia or of recent drug use, and the *1158 defendant's physical proximity to the drugs. See, State v. Howard, supra ; State v. Toups, supra ; State v. Anderson, supra.
Five factors have been identified as useful in determining whether circumstantial evidence is sufficient to prove intent to distribute a controlled dangerous substance. The factors include: (1) whether the defendant ever distributed or attempted to distribute the controlled dangerous substances; (2) whether the drug was in a form usually associated with possession for distribution to others; (3) whether the amount of the drug created an inference of an intent to distribute; (4) whether expert or other testimony established that the amount of drug found in the defendant's possession is inconsistent with personal use; and (5) whether there were any paraphernalia, such as sandwich bags or scales, evidencing an intent to distribute. State v. Cummings , 46,038 (La. App. 2 Cir. 1/26/11), 57 So.3d 499, writ denied , 2011-0341 (La. 6/17/11), 63 So.3d 1037. Mere possession of contraband does not amount to evidence of intent to distribute unless the quantity is so large that no other inference is possible. State v. Holden , supra . The amount of drugs may be a relevant factor, but regardless of the amount, intent to distribute must still be proven. State v. Howard , 2015-1404 (La. 5/3/17), 226 So.3d 419 ; State v. Ellis , 2014-1511, (La. 10/14/15), 179 So.3d 586.
In State v. Howard, supra , this Court and the state supreme court upheld Howard's conviction for possession of marijuana with intent to distribute. In a bedroom where Howard was lying in bed, officers found four bags containing a total of 11 grams of marijuana in a larger bag tied around the waistband of Howard's boxer shorts that were on the bedroom floor. Also found in the bedroom or its closet were another bag containing 7 grams of marijuana, a box of plastic sandwich bags, some jeweler's bags, a gun, and an empty prescription bottle. Howard told the police that the marijuana belonged to him for personal use. No cash was found, but no smoking paraphernalia or devices, indicating the marijuana was intended for personal use, were found either.
Simon's parole officer and the assisting law enforcement officers found a total of 694 grams of marijuana in Simon's house, with some on Simon's kitchen table, some in a laundry basket in Simon's kitchen/laundry area, and the rest in two bags located in Lane's bedroom. Simon admitted to his parole officer that he knew there was marijuana in the house, and Simon had access to all rooms containing the marijuana. The evidence was sufficient to infer that Simon had dominion and control over the marijuana, given Simon's physical proximity and access to the drugs.
Consistent with the distribution of drugs, a large amount of marijuana, some of it individually packaged in plastic sandwich bags, was found in Simon's house. Also consistent with the distribution of drugs, a large amount of cash in small denominations, separated into plastic sandwich bags, was found under Simon's bed. In addition, Simon reported that he did not have a job or steady source of income to account for that money. The officers did not find evidence of personal use paraphernalia or devices that would indicate that the 694 grams of marijuana was for personal use. The state's expert, Townley, testified that this amount would be equivalent to two years' worth of marijuana for a normal user and one year's worth for a heavy user, except that the marijuana would spoil in the manner in which it was found packaged. Townley testified that these factors indicated the marijuana was for distribution rather than personal use. Townley also estimated that the marijuana had a retail value of almost $7,000. In light of the amount of marijuana and cash *1159 found, and the packaging consistent with distribution, the evidence was sufficient to infer that Simon had intent to distribute the marijuana.
Lane and Powell, two of Simon's co-perpetrators who were also charged with possession with intent to distribute, testified that the marijuana belonged only to them for their personal use, sharing with friends, and occasional sales. Without much elaboration, Powell offered that the cash hidden under Simon's bed was the proceeds from an auto accident. Powell stated that she and Lane each contributed $300 to purchase the marijuana. Even allowing for a lower price for marijuana purchased in bulk instead of by the gram, it is difficult to believe that two pounds of marijuana could be obtained for $600. While Lane and Powell insisted that Simon knew nothing about any of the marijuana, the verdict indicates that the jury did not find their testimony to be credible.
Considering the evidence in a light most favorable to the prosecution, the evidence was sufficient for the jury to conclude that all elements of the charge of possession of marijuana with intent to distribute were proven beyond a reasonable doubt. Simon's assignment of error regarding the sufficiency of the evidence is without merit.
Batson challenge
Simon contends in his second assignment of error that the trial court's determination that the defendant failed to make a prima facie showing of a Batson violation was error.
Trial in this matter began on January 23, 2017, with jury selection by the state and the defendant's appointed counsel. Four panels of 12 prospective jurors each were brought before the court.
The first panel was composed of three African-American prospective jurors and nine Caucasian prospective jurors. Neither side made any challenges for cause. The state made four peremptory challenges, three of which were against African-American potential jurors, while the defense peremptorily challenged three Caucasian potential jurors. From the first panel, five Caucasian jurors were empaneled on the jury.
The second panel was composed of five African-American prospective jurors and seven Caucasian prospective jurors. The state challenged five potential jurors for cause; three of these potential jurors were African-American. The defense objected to three of the challenges for cause, but withdrew one of these objections. Four of the five challenges for cause were granted. The defense made no challenges for cause. The state raised one peremptory challenge, against the same African-American prospective juror who was not excused for cause.[2] The defense peremptorily challenged two persons for cause, both Caucasian.
At this point, the defense objected and claimed a Batson violation.[3] The defense argued that out of the five peremptory challenges that the state had so far exercised, four of them were for African-American jurors, and that the state had peremptorily excluded all three African-American persons on the first panel. The trial judge stated that he would review the issue from the perspective of the state of the jury panel at that time, which showed *1160 10 jurors seated so far, and two of the jurors were African-American. The trial court found that there was no established pattern showing that the state had systemically used its peremptory challenges to exclude African-Americans from the jury.
From the second panel, two African-Americans and three Caucasians were empaneled on the jury. After the second panel, the jury was composed of two African-Americans and eight Caucasians. The state had exercised a total of five peremptory challenges, four of which were against African-American potential jurors.
The third panel was composed of three African-American potential jurors and nine Caucasian potential jurors. One Caucasian prospective juror was excused by the judge. The state challenged two prospective jurors for cause: one African-American and one Caucasian. The defense did not object to either challenge for cause, and both were granted. The defense did not challenge anyone for cause. The state peremptorily challenged one potential Caucasian juror, while the defense peremptorily challenged four potential Caucasian jurors.
Next, the state made two backstrikes, peremptorily challenging one African-American potential juror and one Caucasian potential juror. The defense made one backstrike, peremptorily challenging one Caucasian potential juror. The only person added to the jury from the third panel was an African-American juror. The defense raised a second Batson violation claim. The trial judge observed that there was no pattern of exclusion because three African-Americans jurors had been empaneled on the jury at that point. The defendant's attorney stated that he did not want to argue, and asked that the court simply note his objection.
After the third panel, the jury was composed of three African-American jurors and eight Caucasian jurors. The state had exercised a total of eight peremptory challenges, five of which had been used to exclude African-American prospective jurors from the panel.
The fourth panel was composed of seven African-American prospective jurors and five Caucasian prospective jurors. However, one potential juror did not appear for jury duty, while another potential juror arrived late and fell asleep. The state challenged four prospective jurors, all of whom were African-American, for cause. The defense did not object to any of these challenges for cause, and all were granted. The defense raised no challenges for cause. The state made no peremptory challenges, while the defense peremptorily challenged one Caucasian potential juror. This left three African-American potential jurors and four Caucasian potential jurors. The next potential juror on the list was empaneled to the jury, bringing the total to 12, with three African-American jurors and nine Caucasian jurors. The court proceeded with selection of an alternate juror, who was Caucasian.
Simon argues that a prima facie showing of a Batson violation was made when the state peremptorily challenged all three of the African-American potential jurors from the first panel and another African-American potential juror from the second panel. In other words, from two panels, four of the five peremptory challenges raised by the state were used to exclude African-American prospective jurors. Simon's attorney raised a second challenge after a fifth African-American potential juror was excluded during the third panel but then decided not to argue the objection. Simon contends that the issue is whether the state excluded any of these jurors on the basis of race and that the trial court erred in overruling his Batson challenge on grounds that not all African-American *1161 prospective jurors were excluded from the jury.
The state contends that the issue is whether the defendant successfully proved that the state's exercise of its peremptory challenges demonstrated a pattern of purposeful discrimination against African-American jurors. The state argues that the trial court was correct in concluding that there was no prima facie showing because the defendant failed to demonstrate that the state established a pattern of using its peremptory challenges to purposefully exclude African-Americans from the jury.
An exercise by the state of its peremptory strikes to remove potential jurors from the venire panel solely on the basis of race or gender violates the Equal Protection Clause of the United States Constitution. See Batson v. Kentucky , supra. Batson was codified in La. C.Cr.P. art. 795.
In State v. Crawford , 2014-2153, pp. 27-28 (La. 11/16/16), 218 So.3d 13, 30, our supreme court discussed the Batson analysis:
Batson and its progeny from this court provide a three-step process to guide courts in evaluating a claim of racial discrimination in the voir dire process:
(1) a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race;
(2) if the requisite showing has been made, the prosecution "must demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result;' " and
(3) in light of the parties' submissions, the trial court must determine if the "defendant has established purposeful discrimination."
The burden of persuasion never shifts from the opponent of the strike. However, after the opponent of the strike establishes a prima facie case of racial discrimination, the burden of production shifts to the proponent of the strike to articulate race-neutral reasons for its use of peremptory challenges. Not until steps one and two of the Batson test have been satisfied is the trial court's duty under step three triggered.
Citations omitted.
A violation of a prospective juror's equal protection rights under Batson is proven by evidence of a racially discriminatory purpose, not a racially discriminatory result. State v. Dorsey , 2010-0216 (La. 9/7/11), 74 So.3d 603, cert. denied , 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012) ; State v. Green , 94-0887 (La. 5/22/95), 655 So.2d 272. Thus, the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. State v. Dorsey, supra ; State v. Green, supra .
To establish a prima facie case, the objecting party must show: (1) the striking party's challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the peremptory challenge was used to strike the venireperson on account of his or her being a member of that cognizable group. If the trial court determines the opponent failed to establish the threshold requirement of a prima facie case (step one), then the analysis is at an end and the burden never shifts to the proponent of the strike to articulate neutral reasons (step two). State v. Nelson , 2010-1724 (La. 3/13/12), 85 So.3d 21.
Regarding the approach to determine whether the defendant has made a prima facie case, our supreme court has stated:
The defendant may offer any facts relevant to the question of the prosecutor's *1162 discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
State v. Green , 94-0887 at p. 24, 655 So.2d at 288.
No formula exists for determining whether the defense has established a prima facie case of purposeful racial discrimination. State v. Berry , 51,213 (La.App. 2 Cir. 5/17/17), 221 So.3d 967.A trial judge may take into account not only whether a pattern of strikes against African-American venirepersons has emerged during voir dire , but also whether the prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose. State v. Jacobs , 1999-0991 (La. 5/15/01), 803 So.2d 933, cert. denied , 534 U.S. 1087, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002).
Simon is African-American. However, the mere invocation of Batson when minority prospective jurors are peremptorily challenged in the trial of a minority defendant does not present sufficient evidence to lead to an inference of purposeful discrimination. State v. Draughn , 2005-1825 (La. 1/17/07), 950 So.2d 583, cert. denied , 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). In Draughn , the state's exercise of peremptory challenges to exclude four African-American potential jurors, by itself, was considered insufficient to support a prima facie finding under Batson .
Bare statistics alone are insufficient to support a prima facie case of discrimination. State v. Dorsey, supra . The determination of whether a prima facie case was established is fact-intensive, and per se rules regarding numbers are inconsistent with Batson , which requires consideration of all relevant circumstances. State v. Duncan , 99-2615 (La. 10/16/01), 802 So.2d 533. The defendant must present facts, not just numbers alone, in the attempt to establish a prima facie case. Id.
In Duncan , the defendant claimed that the state's use of five of its eight peremptory challenges to exclude African-American potential jurors violated Batson , but the Louisiana Supreme Court held that the defendant's reliance on bare statistics in an attempt to establish a prima facie case was misplaced. While the supreme court in Duncan recognized that the mere presence of African-Americans on the jury did not bar a finding of a prima facie case of discriminatory intent, it also noted that the fact that the state did not exclude all African-Americans from the jury may be considered in the determination of whether a prima facie case existed.
In State v. Dorsey, supra , the defendant claimed that the state's peremptory challenge to five of the eight African-American prospective jurors was a Batson violation. The trial court denied the objection, finding no systematic pattern of exclusion based on race. The Louisiana Supreme Court held that the defendant's reliance on statistics alone did not support a prima facie case of racial discrimination. The court noted that while there was a disparity in the state's use of its peremptory challenges, the defendant failed to present any facts to support a prima facie case of purposeful discrimination.
The trial court plays a unique role in the dynamics of voir dire , for it is the court that observes firsthand the demeanor *1163 of the attorneys and the venirepersons, the nuances of questions asked, the racial composition of the venire, and the general atmosphere of the voir dire that simply cannot be replicated from a cold transcript. See State v. Jones , 42,531 (La.App. 2 Cir. 11/7/07), 968 So.2d 1247. The trial court's determination that the defense has failed to set forth a prima facie case of purposeful discrimination merits great deference on appeal. State v. Berry , supra ; State v. Tucker , 591 So.2d 1208 (La.App. 2 Cir. 1991), writ denied , 594 So.2d 1317 (La. 1992).
Simon's initial Batson challenge was based solely on the ground that four of five peremptory challenges exercised by the state during the first two panels were used to strike African-American potential jurors. The first factor to establish a prima facie case was clearly met, as those four potential jurors were African-American. Regarding the second factor to establish a prima facie case, the first three African-American potential jurors were only peremptorily challenged, and the fourth was struck by peremptory challenge after the trial court denied the state's challenge for cause. Simon's attorney made a second Batson objection after the state's fifth peremptory challenge of an African-American prospective juror. However, Simon's attorney then elected not to argue it, thereby abandoning the objection and the defendant's burden to show a prima facie case of purposeful discrimination as to that peremptory challenge.
Simon presented no argument or facts to establish the prosecution's discriminatory intent other than the number of peremptory strikes made. Simon presented no facts regarding the prosecutor's statements or actions, and there was no comparison of the prosecutor's statements, questions, or comments toward the African-American and Caucasian potential jurors to establish that the prosecutor exercised his peremptory challenges with a discriminatory intent. Based on this scant argument and considering the state's use of four out of five peremptory challenges to strike African-American potential jurors and that two African-American jurors were already selected for the jury at that time, the trial judge found no systematic pattern of discriminatory intent.
From our review of each peremptory challenge by the prosecution, the responses of the jurors who were peremptorily struck, and the prosecutors' statements, questions, and comments during voir dire , we do not discern any inference of a race-based use of peremptory challenges by the prosecution:
• An African-American female on the first panel knew a couple of Simon's family members, and she also thought recreational use of marijuana should be legalized.
• Another African-American female on the first panel had an incident involving a fight with her sister, but was not arrested. She admitted that she sometimes holds ill will against law enforcement.
• An African-American male on the first panel had been arrested for rape; the charges were ultimately dismissed.
• A Caucasian female on the first panel had been convicted of a crime but it was expunged. She thought marijuana should be legalized for recreational use.
• An African-American male on the second panel had been accused of crimes in the past, although he had never been convicted. He was also very interested in the potential economic impact of the legalization of marijuana, and considered moving to California to study the industry.
• A Caucasian male on the third panel thought marijuana should be legalized *1164 for medicinal purposes, and his grandfather had a prescription for medical marijuana to treat Parkinson's disease.
• An African-American male on the third panel knew Simon's family and would see them "out and about," but he didn't know the defendant personally. He also had a cousin convicted of possession of crack cocaine in Desoto Parish six years earlier, and thought marijuana should be legalized for medical and recreational purposes.
• A Caucasian male on the third panel was hearing impaired and was given a hearing device during voir dire to help him. He also had difficulty comprehending an analogy used by the prosecutor, and at one point during questioning, the trial judge asked the prosecutor if he wanted the judge to help him out.
In conclusion, recognizing the deference owed to the trial court, the defendant's reliance on statistical data alone, the voir dire responses of the potential jurors peremptorily challenged by the state, and the fact that three African-Americans were on the jury despite the state not exhausting all of its peremptory challenges, we conclude that the trial court's determination that Simon failed to establish a prima facie case of racial discrimination was not an abuse of discretion. Accordingly, this assignment of error is without merit.
Excessive sentence
In his third assignment of error, Simon contends that the trial court erred by imposing a constitutionally harsh and excessive sentence. Simon argues that the imposed sentence of 20 years at hard labor, run consecutively to his other sentences, was a needless imposition of pain and suffering.
The state argues that Simon's 20-year sentence fell within the statutory guidelines of 5-30 years. The state argues that the sentence was not constitutionally excessive where Simon had two prior convictions for drug distribution offenses, showing a history of drug sales and a history of parole/probation violations.
When a defendant fails to file a motion to reconsider sentence pursuant to La. C. Cr. P. art. 881.1, the appellate court's review is limited to the bare claim that the sentence is constitutionally excessive. State v. Mims , 619 So.2d 1059 (La. 1993) ; State v. Boyd , 46,321 (La. App. 2 Cir. 9/21/11), 72 So.3d 952. Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Lobato , 603 So.2d 739 (La. 1992) ; State v. Livingston , 39,390 (La. App. 2d Cir. 4/6/05), 899 So.2d 733 ; State v. White , 37,815 (La. App. 2 Cir. 12/17/03), 862 So.2d 1123.
A sentence violates La. Const. art. I, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than the purposeless infliction of pain and suffering. State v. Dorthey , 623 So.2d 1276 (La. 1993). A sentence is grossly disproportionate if, when the crime and punishment are viewed in light of the harm to society, it shocks the sense of justice. State v. Weaver , 2001-0467 (La. 1/15/02), 805 So.2d 166.
The trial court is given wide discretion in the imposition of sentences within the statutory limits. Such a sentence will not be set aside as excessive absent a manifest abuse of that discretion. State v. Williams , 2003-3514 (La. 12/13/04), 893 So.2d 7 ; State v. Diaz , 46,750 (La.App. 2 Cir. 12/14/11), 81 So.3d 228.
La. R.S. 40:966(B)(3), at the time the offense was committed on June 8, 2016, provided that the penalty for possessing marijuana with the intent to distribute was *1165 imprisonment at hard labor for 5-30 years, and a fine of not more than $50,000.
Courts have upheld sentences for possession of marijuana with intent to distribute that imposed terms ranging from 10 to 30 years. In State v. Traylor , 40,627 (La. App. 2 Cir. 3/8/06), 923 So.2d 947, this Court upheld a 15-year sentence for possession of 161.5 grams of marijuana with intent to distribute, where the defendant had a significant history of criminal activity and had four prior felony convictions. In State v. Purvis , 51,215 (La. App. 2 Cir. 4/5/17), 217 So.3d 620, this Court upheld a 15-year sentence for possession of 28 grams of marijuana with intent to distribute where the defendant, although remorseful for his conduct, had prior convictions for illegal use of a weapon, attempted possession with intent to distribute, and illegal use of a firearm. See also, State v. Allen , 49,642 (La. App. 2 Cir. 2/26/15), 162 So.3d 519, writ denied , 2015-0608 (La. 1/25/16), 184 So.3d 1289, where this Court upheld two 10-year sentences for distribution of marijuana, run concurrently with each other, but consecutively to the defendant's prior sentences.
In State v. Brown , 03-581 (La. App. 5 Cir. 11/12/03), 861 So.2d 644, writs denied , 2003-3407 (La. 4/2/04), 869 So.2d 875, and 2004-0049 (La. 4/2/04), 869 So.2d 877, the defendant received a maximum 30-year sentence for possession of 1,578 grams of marijuana with intent to distribute that was to be served concurrently with a mandatory minimum 30-year sentence for possession of cocaine in excess of 400 grams. Brown had been convicted of both crimes at the same trial. Upholding the sentence for the marijuana-based conviction, the Fifth Circuit noted the large amount of marijuana found, the defendant's prior drug arrests, and a separate drug possession conviction between the dates of conviction and sentencing.[4]
The 20-year imposed sentence falls within the statutory guidelines and is not the maximum sentence. The trial judge considered the circumstances of the instant crime, where law enforcement officers found over one pound of marijuana and over $7,000 in cash in Simon's home, and Simon admitted to his parole officer that he ignored her directive to stop because he knew there was marijuana in his house. The trial judge also considered Simon's criminal history, which shows he has at least three prior felony convictions, two of which were for possession with the intent to distribute, and a history of violating his parole/probation. The trial judge concluded that Simon had demonstrated that he had no intention of being rehabilitated despite prior attempts to afford him that opportunity and leniency in sentencing. Simon showed no remorse or responsibility for his actions. Given the circumstances in Simon's case, the 20-year imposed sentence does not shock the sense of justice and is not constitutionally excessive.
CONCLUSION
For the foregoing reasons, Navarius Simon's conviction and sentence are AFFIRMED.

Lane testified that he had packaged the marijuana in the Crown Royal bag in case anyone wanted to purchase some. There were apparently at least 12 Baggies of marijuana in the Crown Royal bag.

The record reveals that the state challenged him for cause on the grounds that he believed marijuana should be legalized, he could not judge another person, and he could not say that he could render a verdict to convict. The defense objected. The trial court denied the challenge for cause, finding that this prospective juror, who was African-American, had been "rehabilitated" during the defense's voir dire questions.

Batson v. Kentucky , 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

The 30-year sentence for the cocaine possession was also upheld.