GARRETT, J.
The defendant, Patricia Hampton, was convicted of theft over $1,500, in violation of La. R.S. 14:67. She was sentenced to three years at hard labor, with all but one year suspended, and two years of supervised probation. Restitution was ordered with a provision for early termination of probation upon payment of restitution. The defendant appeals. Finding merit to the defendant's assignment of error pertaining to her Batson challenges, we vacate the defendant's conviction and sentence. The matter is remanded for a new trial.
FACTS
In 2003, the defendant was hired by Mayor Eugene Smith as the payment clerk for the Water & Sewer ("W & S") Department of the Town of Arcadia ("the Town"). Her job duties included receiving payments in the form of cash or checks, logging the payments into the W & S computer system, printing out a daily report of payments, and depositing the funds into the Town's bank accounts.
In 2010, a routine audit of the Town's records found discrepancies between the payments received and the deposits made for the W & S Department. The auditors advised the mayor of the situation. The matter was then turned over to the Office of the Inspector General of Louisiana ("IG"), which opened an investigation. It was ultimately determined that there was a discrepancy of $39,076.60 between the amounts of W & S funds collected and deposited.
Pending the investigation, the defendant was suspended without pay in October 2010. She was subsequently fired, effective February 1, 2011. On August 30, 2011, the defendant was indicted for theft over $1,500, for the time period between July 2007 and August 2010.[1]
Over the next six years, continuances were obtained by both the prosecution and the defense. Trial was finally held in September 2017. A six-person jury found the defendant guilty as charged. In *998 January 2018, the trial court imposed a sentence of three years at hard labor; however, it suspended all but one year of the sentence and ordered two years of supervised probation. The trial court further directed that the defendant pay restitution to the Town, but specified that it would allow early termination of probation upon payment of restitution.[2]
The defendant appeals, asserting 11 assignments of error. However, due to our disposition of the assignments concerning the defendant's Batson challenges, we do not reach most of them.
SUFFICIENCY OF EVIDENCE
The defendant contends that the evidence, viewed in the light most favorable to the state, did not support the jury's verdict beyond a reasonable doubt.
Law
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence.[3] The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana , 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold , 603 So.2d 731 (La. 1992) ; State v. Pratt , 50,152 (La. App. 2 Cir. 12/30/15), 184 So.3d 816, writ denied , 16-0123 (La. 1/25/17), 215 So.3d 262. A reviewing court, examining all of the evidence in the light most favorable to the prosecution, must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia , supra ; State v. Crawford , supra .
The Jackson standard does not permit this court to substitute its own appreciation of the facts for that of the fact finder. State v. Robertson , 96-1048 (La. 10/4/96), 680 So.2d 1165. It is not the province of the reviewing court to assess the *999 credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442 ; State v. Crawford , supra . A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason , 43,788 (La. App. 2 Cir. 2/25/09), 3 So.3d 685, writ denied , 09-0725 (La. 12/11/09), 23 So.3d 913, cert. denied , 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010) ; State v. Simon , 51,778 (La. App. 2 Cir. 1/10/18), 245 So.3d 1149.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational trier of fact to conclude, beyond a reasonable doubt, that the defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; State v. English , 51,505 (La. App. 2 Cir. 8/9/17), 243 So.3d 1145.
Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. State v. Walker , 51,217 (La. App. 2 Cir. 5/17/17), 221 So.3d 951, writ denied , 17-1101 (La. 6/1/18), 243 So.3d 1064 ; State v. Matthews , 50,838 (La. App. 2 Cir. 8/10/16), 200 So. 3d 895, writ denied , 16-1678 (La. 6/5/17), 220 So.3d 752.
Direct evidence provides proof of the existence of a fact, for example, a witness's testimony that he saw or heard something. Circumstantial evidence provides proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Lilly , 468 So.2d 1154 (La. 1985) ; State v. Patterson , 50,305 (La. App. 2 Cir. 11/18/15), 184 So.3d 739, writ denied , 15-2333 (La. 3/24/16), 190 So.3d 1190.
When the conviction is based on circumstantial evidence, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. When a case involves circumstantial evidence, and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville , 448 So.2d 676 (La. 1984) ; State v. Walker , supra ; State v. Matthews , supra .
When a jury reasonably and rationally rejects the exculpatory hypothesis of innocence offered by a defendant's own testimony, an appellate court's task in reviewing the sufficiency of the evidence under the Due Process Clause is at an end unless an alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. State v. Calloway , 07-2306 (La. 1/21/09), 1 So.3d 417 ; State v. Walker , supra ; State v. Matthews , supra .
In all cases where an essential element of the crime is not proven by direct evidence, La. R.S. 15:438, concerning proof by circumstantial evidence, applies. As an evidentiary rule, it restrains the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a *1000 question of law. State v. Shapiro , 431 So.2d 372 (La. 1982) ; State v. Matthews , supra .
The elements of the crime of theft are: (1) there must be a misappropriation or taking; (2) the misappropriation or taking must be of a thing of value; (3) the thing must belong to another; and (4) the misappropriation or taking must be with the intent to deprive the other permanently of that which is the subject of the taking. The prosecution must also prove the value of the stolen thing because the value is determinative of both the severity of the offense and the degree of the punishment upon conviction. State v. Robinson , 51,498 (La. App. 2 Cir. 8/9/17), 243 So.3d 1169.
Testimony
The evidence presented at trial established the access that different employees at Arcadia's city hall had to the W & S payment funds.
At the start of her workday, the defendant, as the water collections clerk, would remove payments left in a drop box outside of city hall; this usually included payments that were mailed.[4] She would then unlock her office in city hall. The only individuals having keys to her office were the defendant, the mayor, and a cleaning lady. The defendant would unlock the cash drawer in her desk and count the drawer to ensure that she had $100 cash to start the day; these funds were used to make change when customers paid cash. Several witnesses, including the defendant herself, testified that she had the only key to the cash drawer. Aundrea Crane, who worked for the Arcadia police chief and had an office in city hall, testified that the defendant carried that key on her wrist on a band and that the defendant consistently locked the drawer. The defendant testified that she carried her keys on her wrist when she arrived in the morning and that during the workday she would hide the keys under a shelf in her office until she got ready to leave at the end of the day. The defendant testified that there was a lockbox in the cash drawer, that she had keys to both the lockbox and the cash drawer, and that she was the only one with control over that cash.
During the course of the day, the defendant would take payments from customers at the water collections window of her office. She would enter the payment into the EasyBill program on her computer and give the customer a receipt. She and Louria Dell Jefferson, the water billing clerk whose office was across the hall from the defendant's, were the only two individuals who had the EasyBill program on their computer. At the end of the workday, a printout was generated showing the details of the day's payments, including the amount and the name of the customer. The defendant was then responsible for counting the funds, filling out deposit slips, and taking the funds to the bank for deposit *1001 into the Town's accounts.[5] She subsequently brought the deposit slip she got from the bank to the Town clerk, who entered the deposits into the Town's bookkeeping system.[6] At some point, the defendant began stapling the day's deposit slip to the report generated by the computer for that day. If the deposit slip and the report matched, the Town clerk had no concerns.
Several other city hall employees would occasionally accept payments if the defendant was not at her collections window. If the defendant was gone for several days, Jefferson would take the payments. She gave the customers manual receipts, put the payments in a bag, and gave them to the defendant upon her return. According to Burris, if a customer came while the defendant was away, she would slide the payment under the defendant's window. Burris testified that she did not post entries on the defendant's computer. She also testified that she never saw Jefferson post anything to the system either. Mayor Smith testified that he did not recall ever receiving a water payment.
Crane, who began working for the police chief in March 2009, testified that she would be asked to collect water payments if the defendant was in an employee meeting or if the defendant asked her to do so when she briefly left her office. However, she was not called upon to do so often. Crane said she would scan the barcode on the bill, and the customer's name popped up on the computer. She would place cash payments in the cash drawer and then give the customer change, if required, and a receipt. If the customer paid by check, she would usually hold the check and the bill for the defendant to enter. She also stated that Jefferson and Burris would take payments and had access to the defendant's office. She testified that, when Jefferson took a payment, she would not enter it in the computer; instead, Jefferson would write a receipt by hand, put the money in a bag, lock it up, and give it to the defendant upon her return. While Crane said she knew Burris made computer entries, it "seldom" happened.
Testimony was given about the EasyBill computer program utilized in the W & S billing and collections. Mayor Smith testified that, shortly after he became mayor in 2003, EasyBill was acquired to replace a much more expensive system. However, EasyBill did not automatically integrate with the Town's accounting system as the prior system did; consequently, billing and collections data had to be manually entered into the accounting system. On occasion, there were issues with EasyBill which required that the program be remotely accessed by its vendor, David Carraway, from his office in Mississippi, so he could fix it.[7] Jefferson, the only other person who had EasyBill on her computer, *1002 testified that she had no complaints about the program.
Burris recalled customers coming in "quite often" with a cancelled check and complaining about not receiving credit for payments made and the defendant telling them that she would correct it. Crane also remembered customer complaints about their bills not being correct and Carraway being contacted by the defendant and Jefferson for assistance; she said it "happened a lot." The defendant testified that she had problems with her computer with customers' names not showing up on the log sheet she printed. She said that she did not know about it until they complained about not getting credit for payments. She testified that, after verifying on the computer that the customer had credit, she would call Carraway, who would manually take care of it or tell her how to correct the problem. The defendant conceded in her testimony that Carraway had no access to or control of the money, whereas she did.
Stephanie Perry testified that she and her partner, Tonya Wade, performed governmental audits in 2008, 2009, and 2010 to check whether the Town's books were materially correct. They initially discovered a minor discrepancy of $92 for January 2010. They informed the mayor, who asked them to investigate further. For January 2010, they found discrepancies on six days which showed differences between receipts and deposits totaling $868.30. For February 2010, discrepancies were found on 11 days with a difference between receipts and deposits of $1,040.75. For March 2010, there were discrepancies on three days totaling $63.26. For July 2010, they found discrepancies on three days which totaled $262.09. For the four months they tested, the discrepancies totaled $2,234.40. After determining that the water deposits did not match the water receipts, they informed the mayor of their findings and the matter was turned over to the IG Office.
Tom Boulton, a criminal investigator for the IG Office, testified that when he took over the case, the defendant had already been indicted. He and two other investigators, Tracie Richard and Jennifer Monteleone, reviewed the evidence themselves and prepared a spreadsheet outlining the thefts. Monteleone also testified. She and Boulton described the documents and methodology they used in the course of their investigation. Among other things, they reviewed the Town's bank records, deposit records, monthly statements, and the Town's generated records showing the amount reported as collected and entered into the system for the water billing collections. Their spreadsheet covered the dates of June 29, 2007, to June 29, 2010. It showed a difference of $39,076.60 between the amount deposited into the bank and the amount entered into the computer as collected. According to Monteleone's testimony, the deposits were less than what was entered into the computer on 307 days and more than what was entered on 34 days.
David Watson, an investigator for the Bienville Parish District Attorney's Office, reviewed the financial records of the defendant and her husband. He found that they routinely deposited cash in their joint bank account and paid the defendant's car note in cash. This pattern continued even after the defendant was suspended without pay and she obtained other employment.
The defendant's husband testified for the defense and was questioned about their financial situation. Of particular note, he stated that he had taken out loans against his 401k account - $1,200.00 on August 9, 2007, and $2,105.63 on December 6, 2010. He also had made two to three hardship withdrawals from his 401k account, which ranged from $900 to $1,200.
*1003 On cross-examination, he admitted taking money out of his 401k account every year between 2007 and 2010 for "serious" financial issues.
The defendant testified. She said that, in addition to herself, payments were taken by the mayor, Jefferson, Crane, and Burris. She admitted that there was no reason to think that Jefferson took any money. As to Crane, the defendant stated that she did not enter payments often and, while she knew how to enter payments in the system, she did not know how to print a report at the end of the day. The defendant initially testified that, when Crane took payments, she would show the defendant what she entered; however, later in the defendant's testimony, she stated that, when Crane told her that she had taken a payment and entered it, she did not go into the computer and look at the entry. The defendant initially testified that Burris did not know how to print the report either. She then said Burris did know how and furthermore denied saying that Burris did not know how. She stated that Burris knew how but had never printed out a report. The defendant said she did not check the entries made by Burris. She also testified that the reports she printed at the end of the day were eventually boxed up and placed in storage. When Perry and Wade, the Town's auditors, requested reports, she printed out the ones on the computer instead of retrieving the ones that had been boxed up.
Discussion
The testimony established that the defendant was the only person who, on a daily basis, had physical possession of the cash that was paid on water bills, as well as control over the computer entries of the payments into the EasyBill program, the preparation of the deposit slips, the printing of the daily report, and the transfer of the funds to the bank. While other city hall personnel occasionally performed some of these functions, only the defendant exerted control over all of these steps.
The defendant attempted to cast blame upon other city hall employees, especially Burris. However, it is noteworthy that the thefts at issue began in 2007, and both Crane and Burris, the only other persons who made entries of water payments into the computer system, did not begin working at city hall until, respectively, March 2009 and April 2009.
The audits showed discrepancies in excess of $39,000.00. However, the state was only required to prove that the defendant had stolen the threshold amount for felony theft, which the indictment stated was $1,500. To satisfy this element of the offense, the state introduced during Boulton's testimony three exhibits which showed the differences between the amounts entered and the amounts deposited for the dates of November 6, 2007 ($835.30), January 13, 2009 ($546.32), and July 21, 2009 ($475.73). Added together, they amounted to an aggregate of $1,857.35. Also admitted were deposit slips from those dates which the defendant conceded were in her handwriting.
However, on each of these three dates, La. R.S. 14:67 provided that the threshold for the highest grade of theft was only $500, not $1,500.[8] In fact, we note the spreadsheet used by the IG investigators in their testimony only went up to the end of June 2010, before the highest grade of theft was raised from $500 to $1,500 on August 15, 2010. Consequently, the missing funds on the November 6, 2007 and January 13, 2009 dates alone were separately sufficient to prove felony theft. Furthermore, *1004 as noted above, neither Burris nor Crane, the only other persons known to enter water payments into the computer system, worked in city hall at those times. Additionally, the defendant admitted Crane did not know how to print the report at the end of the day; she admitted the same as to Burris. However, she then denied making her initial statement that Burris lacked that knowledge, and then said that Burris knew how but had never done it.
We find that, viewed in the light most favorable to the prosecution, the evidence was sufficient to support the defendant's conviction for felony theft regardless of whether the amount was $500 or $1,500. The jury's decision to accept the testimony of the state's witnesses and reject the defendant's self-serving testimony was a credibility call and entitled to great deference. The jury reasonably rejected the hypothesis of innocence presented by the defendant's testimony and no alternative hypothesis was sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt. The defendant alone had unfettered access to the funds and the ability to conceal the thefts. This assignment of error lacks merit.
BATSON ISSUES
The defendant, who is an African-American woman, raises several assignments of error pertaining to mistakes made during jury selection, including improprieties in the handling of her Batson challenges.[9] We find merit in several of these complaints as the trial court committed legal error in its analysis of the defendant's Batson challenges and deprived the defendant of any meaningful consideration of her claims.
To explain our ruling, we find it necessary to first set forth our understanding of how Batson challenges should be handled by the lower court. Next, we find it necessary to set forth, in some detail, what occurred in this case during jury selection.
Law
The Constitution forbids striking even a single prospective juror for a discriminatory purpose. Foster v. Chatman , --- U.S. ----, 136 S.Ct. 1737, 1747, 195 L.Ed.2d 1 (2016) ; Snyder v. Louisiana , 552 U.S. 472, 478, 128 S.Ct. 1203, 1208, 170 L.Ed.2d 175 (2008). An exercise by the state of its peremptory strikes to remove potential jurors from the venire panel solely on the basis of race violates the Equal Protection Clause of the United States Constitution. See Batson v. Kentucky , 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). Batson and its progeny provide a three-step process to guide courts in evaluating a claim of racial discrimination in the voir dire process:
(1) a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race;
(2) if the requisite showing has been made, the prosecution "must demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result;' " and
(3) in light of the parties' submissions, the trial court must determine if the "defendant has established purposeful discrimination."
State v. Crawford , supra .
*1005 A violation of a prospective juror's equal protection rights under Batson is proven by evidence of a racially discriminatory purpose, not a racially discriminatory result. State v. Dorsey , 10-0216 (La. 9/7/11), 74 So.3d 603, cert. denied , 566 U.S. 930, 132 S.Ct. 1859, 182 L.Ed.2d 658 (2012) ; State v. Green , 94-0887 (La. 5/22/95), 655 So.2d 272. Thus, the sole focus of the Batson inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. State v. Dorsey , supra ; State v. Green , supra ; State v. Simon , supra .
To establish a prima facie case, the objecting party must show: (1) the striking party's challenge was directed at a member of a cognizable group; (2) the challenge was peremptory rather than for cause; and (3) relevant circumstances sufficient to raise an inference that the peremptory challenge was used to strike the venireperson on account of his or her being a member of that cognizable group. If the trial court determines the opponent failed to establish the threshold requirement of a prima facie case (step one), then the analysis is at an end and the burden never shifts to the proponent of the strike to articulate neutral reasons (step two). State v. Berry , 51,213 (La. App. 2 Cir. 5/17/17), 221 So.3d 967 ; State v. Simon , supra .
To satisfy Batson 's first-step requirement for the establishment of a prima facie case of purposeful discrimination, a moving party need only produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." State v. Crawford , supra ; State v. Elie , 05-1569 (La. 7/10/06), 936 So.2d 791.
The establishment of a prima facie case is not to be so onerous that a defendant would have to persuade the judge - on the basis of all the facts, some of which are impossible for the defendant to know with certainty - that the challenge was more likely than not the product of purposeful discrimination. Johnson v. California , 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) ; State v. Broussard , 16-1836 (La. 1/30/18), --- So.3d ----, 2018 WL 618741 ; State v. Sparks , 1988-0017 (La. 5/11/11), 68 So.3d 435, cert. denied , 566 U.S. 908, 132 S.Ct. 1794, 182 L.Ed.2d 621 (2012).
When a Batson challenge is made, it is incumbent upon the trial judge to address the challenge, either by ruling on whether a prima facie case of discriminatory intent has been made or by requiring race-neutral reasons for the strikes. State v. Myers , 99-1803 (La. 4/11/00), 761 So.2d 498.
The burden of persuasion never shifts from the opponent of the strike. State v. Crawford , supra ; State v. Nelson , 10-1724, 10-1726, (La. 3/13/12), 85 So.3d 21. However, after the opponent of the strike establishes a prima facie case of racial discrimination, the burden of production shifts to the proponent of the strike to articulate race-neutral reasons for its use of peremptory challenges. Not until steps one and two of the Batson test have been satisfied is the trial court's duty under step three triggered. State v. Crawford , supra .
In summary, the responsibility in the three-step Batson test falls first on the opponent of the strike in step one, then on the proponent of the strike in step two, and lastly, on the trial court in step three. State v. Crawford , supra .
The jurisprudence of the United States Supreme Court on Batson is "evolving" and "is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." Johnson v. California , supra ;
*1006 State v. Elie , supra ; State v. Crawford , supra .
In 1986, Batson was codified and implemented in Louisiana when La. C. Cr. P. art. 795 was amended to provide that "[a] peremptory challenge by the state shall not be based solely upon the race of the juror." In 1990, "systematic exclusion" language was added to that statute.[10] In 1993, the statute was amended to remove the "systematic exclusion" language. See Acts 1993, No. 1019. The statute was amended to its current version by Acts 2008, No. 669.[11] In relevant part, it now states:
C. No peremptory challenge made by the state or the defendant shall be based solely upon the race or gender of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race or gender, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory race or gender neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror . Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.[12]
D. The court shall allow to stand each peremptory challenge exercised for a race or gender neutral reason either apparent from the examination or disclosed by counsel when required by the court. The provisions of Paragraph C and this Paragraph shall not apply when both the state and the defense have exercised a challenge against the same juror.
E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral or gender neutral reason is given. Those jurors who have been peremptorily challenged and *1007 for whom no satisfactory racially neutral or gender neutral reason is apparent or given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge.
JURY SELECTION
This case was tried before a six-person jury and required a unanimous verdict. La. C. Cr. P. art. 782. The selection process to obtain the six-person jury and two alternates consumed an entire day. The potential jurors were questioned in two different large panels, as explained below.
The following pertinent exchanges occurred on the record during voir dire:
MR. BOWMAN [lead defense counsel]: I'd ask the record to reflect [prospective juror Starks is] a black female.
THE COURT: Let the record so reflect.
MR. BOWMAN: And at what point - are you going to do the Batsons later? Tell me how you - we want to make a Batson objection to the State's challenge of her.
THE COURT: Well, we -
MR. DAVIS [prosecutor]: We want to make a reverse Batson objection to any challenge you -
THE COURT: I think how we normally do this, I guess we have to have - my opinion is Batsons are peremptories, not cause. So, if you have a systematic exclusion of peremptory challenges, that's when you have to get a reason of why you're -
MR. BOWMAN: Right. I think Batson applies to any peremptory exception whenever you -
THE COURT: It is peremptory, but I think you -
MR. BOWMAN: I understand.
THE COURT: So, what I'm going to do is, once we get - if we have the jury, before I get them sworn in, if you have Batson challenges, then we'll take a break and go back there to get the non-discriminatory reasons.
MR. BOWMAN: Okay.
[The court temporarily accepted Eric Hadnot as a juror, but temporarily excused Kaelan Kidd and Devoseia Goldston.]
MR. BOWMAN: On Goldston, I want to make - again, the record to reflect that he's a black male and the State has used a strikeback against him, and we'll reserve a Batson challenge.
THE COURT: And I think he said the same thing about your Mr. Kidd, so -
MR. BOWMAN: Okay.
THE COURT: Alright. Any challenge or peremptories for Ms. Wallace? Not challenges, but peremptories?
MR. BOWMAN: I'm out.
THE COURT: That's right. Okay.
[Jury selection continued. The following took place during a sidebar conference.]
THE COURT: ...This is your jury. Now is the time for Batsons if you want Batsons . Do you want to do Batsons ?
MR. DAVIS: Are we going to do an alternate first?
THE COURT: No, let's do this. We can do the alternate after we do the Batsons .
MR. BOWMAN: Are we going to do Batsons in your chambers, or how -
THE COURT: No, I'm going to let them go out, and then we'll just do them outside the presence of the -
MR. DAVIS: I mean, before you do Batson , you've got to show a systematic exclusion. We haven't systematically excluded all the blacks.
THE COURT: That's true.
*1008 MR. DAVIS: I think we've excluded two, or excepted two, if I remember right.
MR. COLBY BOWMAN [member of defense team]: Your Honor, under Batson , it doesn't have to be all.
THE COURT: But, it has to be a systematic exclusion.
MR. BOWMAN: He used two of his - he used his peremptories both on blacks.
MR. DAVIS: Well -
MR. BOWMAN: And if that's not systematic, I don't know what is. I mean -
MR. DAVIS: I accepted two, too.
MR. BOWMAN: Okay. Well, that's the reason they call it an objection, and that's the reason we're going to put it on the record, because even though I don't think you can convict her, if you do, she's got a right to an appeal and she's not going to say her lawyer was ineffective.
MR. DAVIS: Well, if we're going to do that, we're going to do a reverse Batson because you excluded all the whites.
MR. BOWMAN: I understand.
MR. DAVIS: All of your challenges were white.
MR. BOWMAN: And I'm prepared to give my reasons.
MR. DAVIS: I (inaudible) some things that have been a systematic exclusion shown, and I think that's the threshold you've got to make before you do a Batson hearing.
MR. BOWMAN: I think we make that outside the presence of this jury instead of arguing it here in the -
THE COURT: We can do that.
MR. BOWMAN: Okay.
THE COURT: Let's take a break and you can give your argument. We can do that, then.
[The trial court sent prospective jurors from the courtroom.]
THE COURT: Okay. Alright. Mr. Bowman?
MR. BOWMAN: Yes, your Honor, as we indicated at the bench, we're at this time going to make a Batson challenge because we believe that the State has exercised a systematic exclusion of people under the same race as my client, and particularly of the challenges for cause which we objected to - and, of course, the State {sic} granted the State's challenge for cause over my objection. But, for the record, as we indicated, we preserved the record of the challenges for cause that the State made, six of those were against African Americans, of the same race which my client is which we've already stipulated for the record.
As it relates to their peremptory challenges, they exercised two, and one of them was a peremptory challenge, and the next one I believe essentially was a peremptory challenge because it was utilized as a strikeback, and those two were against - the original peremptory was against Kembreanna Starks, Juror #211, and the strikeback was against Mr. Goldston, who was Juror #74, both of which we preserved on the record that she was a black female, #211. Mr. Goldston was a white - black male.
THE COURT: Mr. Davis?
MR. DAVIS: Your Honor, first of all, I'd like to point out to the Court that even to have a Batson hearing, it has to be shown a systematic exclusion of a class of people. And, under case law, it's irrelevant whether the defendant is of the same class or race of the challenged juror. Batson only applies to peremptory challenges, not challenges for cause. The State had six peremptory challenges, and only used two. We had four left when the jury selection was over with. So, we don't see where there's any systematic exclusion of *1009 blacks just because we used two of our four challenges for cause {sic} on - for peremptory exceptions. We don't think there's been established a prima facie case of discriminative action in this case, and we think that they haven't met their burden, and we don't think a hearing is necessary, your Honor.
THE COURT: Do you have any further argument?
MR. BOWMAN: The only other argument we have, your Honor, is if you don't call two out of two systematic, I don't know what it is.
MR. DAVIS: Two out of six.
MR. BOWMAN: Well, he only exercised two, and if that's - but, of the two exercised, they exercised against those two.
MR. DAVIS: And, there are two black jurors still on the jury that we did not take off.
THE COURT: Do you have any further argument?
MR. BOWMAN: No, sir, your Honor.
THE COURT: Let the record reflect that the - Ms. Hampton, who is the defendant in this case, is a black female. And, let the record reflect that I agree with Mr. Davis as to the challenges for cause. I think Batson challenges are strictly for peremptory challenges. ...
The two that Mr. Davis has indicated - or, excuse me, Mr. Bowman has indicated that Mr. Davis' systematic exclusion is the two peremptory challenges, one was Ms. Starks and one was Mr. Goldston. Ms. Starks was a peremptory challenge on the original panel, and was a black female. Mr. Goldston is a black male that was used as a strikeback by the State of Louisiana. Of course, I don't know whether Mr. Davis - he hasn't raised regarding his - he hasn't raised a Batson challenge on Mr. Bowman's peremptory challenges.
The jury consists of six people. Four of them are white, and two of them are black females - or black males, I believe. Mr. Davis does have six - or the State of Louisiana does have six peremptory challenges. Mr. Bowman used all six of his. Mr. Davis has used two of the six, and they are African American race. However, he has six challenges left - four left of the six which he has not used. Therefore, this Court finds there is not a systematic exclusion as to those - even though they are both black males, there is no systematic exclusion in that there are two left on the jury that are black males, and there are also six {sic} peremptory challenges left that he could have used, which he didn't.
So, this Court finds that there has been no reason for the Batson challenge as there has been no established systematic exclusion of blacks on the jury.
MR. DAVIS: Your Honor, for the record, the people that were excused that were black were a male and a female.
THE COURT: Excuse me. Yeah, that's correct. But, I mean the two that are on there are male.
MR. DAVIS: They're male, yes.
THE COURT: Anything else?
MR. BOWMAN: We'd ask for our objection to the Court's ruling be noted.
[The proceedings continued with the selection of alternates, during which the trial court announced to the lawyers that it had unilaterally released Georgiana Cato, a prospective juror that the state had unsuccessfully attempted to challenge for cause due to her concerns about missing work. The court stated that it let her go because "this girl cornered me up here," "[s]he said she called *1010 her office and her boss said you've got to come to work," and she was riding with someone else. The trial court had the six members of the jury sworn in. Two alternates were selected and sworn.]
MR. BOWMAN: Your Honor, for purposes of the alternates, we want to ask the record to reflect that - the race of the ones that were excused. Julius was a black male that was excused by the State.
THE COURT: Julius Stafford, Mr. Stafford, right?
MR. BOWMAN: Right. And we'd ask the record to reflect he's a black male that was excused by the State.
THE COURT: Alright.
MR. BOWMAN: Kelli Thomas is a white female accepted by both. Brandon Procell is a white male released by the defendant, and Mr. Rushing, Lowell Rushing, is a black male excused by the State.
THE COURT: Alright. And then Mr. Jackson, because the peremptories were all gone, is a black male.
MR. BOWMAN: He's a black male accepted by default. And, at some point - it can be after you release the jury if you want to, I'm going to reurge my Batson challenge.
THE COURT: Okay.
MR. DAVIS: I might want to reurge a Batson challenge.
THE COURT: You didn't reurge - I mean, you never urged.
[The trial court had the entire panel and alternates sworn. They were escorted from the courtroom. The trial court then thanked and released the remaining members of the venire.]
THE COURT: Let the record reflect that the jury is not present. Mr. Bowman, or Mr. Davis, you said you wanted to make some further argument outside the presence of the jury?
MR. BOWMAN: Yes, your Honor. At this time, we're going to reurge our Batson challenge based upon the record we had preserved on the selection of the two alternate jurors. The State utilized both peremptory exceptions that they utilized, one against a black male - actually, two against - both of them against black males. And, in addition to the two they utilized against a black female and a black male in their selection of the original jury, we feel like now establishes a systematic exclusion of the African American race from the jury, and we reurge our Batson challenge.
MR. DAVIS: My argument is the same as the first. There's no systematic exclusion. We had six, plus two, challenges. We did not use all our challenges. There were black males excluded. There was one black female excluded. We do not believe it's risen to the level where there's even the necessity to have a Batson hearing. Additionally, we would point out to the Court that every challenge the defense used was against a white either male or female, all eight of theirs.
THE COURT: Except the one alternate.
MR. DAVIS: Yes.
THE COURT: Alright. I think the way the Batson thing works is you have to raise the Batson challenges - even though Mr. Bowman did reurge the Batson - Mr. Bowman urged the Batson challenges before the jury was sworn, I think once the jury is sworn and the two alternates, the fact that you reurge it, I think is not timely. I've already let all of the jurors go. There's no way we could bring them back. So, the reurging of the Batson challenge is, therefore, denied.
MR. DAVIS: Thank you, your Honor.
MR. BOWMAN: I would point out for the record, your Honor, I urged it at the *1011 bench and it was my understanding that we were going to urge it on the record and preserve the objection once the jury was excused out or escorted out.
THE COURT: Okay. Let the record so reflect then.
Discussion
The first panel examined during voir dire consisted of 19 prospective jurors. First the court asked them to provide personal information. Then they were questioned more extensively by first the state, then the defense. As best we can glean from the record, the state successfully challenged for cause one white male, two African-American males and one African-American female.[13] The defendant successfully challenged for cause one white female and one white male; she unsuccessfully challenged for cause two white females and one white male.
The prospective jurors at issue here in connection with the Batson challenges were Kembreanna Starks and Devoseia Goldston. Neither of these jurors was challenged for cause by the state. Both were examined during the first panel and the following information was developed about them. Neither of them knew anyone involved in the case. Starks was a 23-year-old African-American female who had just recently graduated from college. She had not yet found a job, but she had worked as a cashier in the school housing office during college. Having worked as a cashier, she stated that she understood that she had to follow certain rules which were to protect her and the person's cash she was handling. Unmarried, she had no children and was living with her grandmother. Although she had a car issue, she said her boyfriend could take the car to be seen about and she could get a ride. There was no challenge for cause lodged by the state against Starks. However, the state exercised a peremptory challenge against her, and the defendant reserved a Batson challenge.
Goldston was an African-American male who was unmarried and had no children.
*1012 He worked as a cashier at a convenience store. As a cashier, he said he had to keep up with money or shortages would come out of his pocket. Because he had not found out about jury duty until the morning of court, he described himself as extremely tired; however, he said he could go to bed early that night. There was no challenge for cause against him by the state. Goldston was originally accepted as a juror, as was a white male cashier, Kaelan Kidd. Both were later removed with backstrikes, Goldston by the state and Kidd by the defendant. The defendant reserved a Batson challenge as to Goldston.
After the backstrikes exercised on the first panel, the jury consisted of two African-American males, two white females, and one white male. The trial court required that the jurors who had been peremptorily challenged remain in the courtroom as they had only been temporarily excused. A second panel of 14 prospective jurors was then examined. A white female juror was added from this panel as the sixth and final juror. The defendant used all of her peremptory challenges. Chosen as alternates were a white female and an African-American male. During selection of the alternates, the state exercised its two peremptory challenges against African-American males.[14] The defense exercised a peremptory challenge against a white male.
As illustrated in the transcript excerpts above, defense counsel tried to assert Batson challenges on several occasions. Throughout the jury selection process, the state argued - and the trial court readily agreed - that the defendant was not even entitled to a " Batson hearing" because she had not proven "systematic exclusion" of "all the blacks" from the jury.[15]
When the defendant was finally allowed to put her arguments pertaining to her Batson challenges on the record, the trial court did not rule on whether a prima facie case of purposeful discrimination, the first step of the Batson process, had been established or require race-neutral reasons for the strikes.[16] Instead, the trial court found that there was no systematic exclusion of blacks because two blacks were on the jury and the state had not used all of its peremptory challenges.
However, "systematic exclusion" is not the correct standard for a Batson analysis, as fully explained above, and the amendments to La. C. Cr. P. art. 795. The mere presence of African Americans on a jury does not necessarily defeat a Batson claim. State v. Collier , 553 So.2d 815 (La. 1989). Furthermore, as previously noted, the Constitution forbids striking even a single prospective juror for a discriminatory purpose. Foster v. Chatman , supra ; Snyder v. Louisiana , supra . A trial court's ruling is not entitled to deference if there is legal error. See State v. Harris , 15-0995 (La. 10/19/16), 217 So.3d 255. We *1013 find that in failing to follow the proper Batson procedure, the trial court committed legal error which irrevocably compromised the jury selection process in the instant case.[17]
Nothing in this record suggests to us that Starks and Goldston would have been anything other than exemplary jurors from the state's perspective, particularly in light of their general work experiences as cashiers and their clearly expressed understanding of the responsibilities of a cashier handling the money of others. It is impossible to discern from the record before us any race-neutral reasons for striking either of these prospective jurors.
We note that the error of the trial court's initial ruling was further compounded by its subsequent actions when the defendant informed the court that she was going to reurge her Batson challenge. The court responded to this statement by saying, "Okay." This indicated to the defendant that she would be allowed to do so. Almost immediately thereafter, the trial court refused to allow the reurging of the Batson challenge on the basis that it was untimely because, in the very brief interval, it had had the jurors and alternates sworn and also released the remaining venirepersons. We note that the trial court had had each individual juror and alternate sworn in immediately after his or her selection pursuant to La. C. Cr. P. art. 788 and as a group after the sixth juror was picked, but stated that it was having the clerk swear them again "out of an abundance of [caution]." The trial court further stated it had "let all of the jurors go" and "[t]here's no way we could bring them back."
La. C. Cr. P. art. 790 states:
When selection of jurors and alternate jurors has been completed, and all issues properly raised under Article 795 have been resolved, the jurors shall then be sworn together to try the case in a just and impartial manner, each to the best of his judgment, and to render a verdict according to the law and the evidence.
As can be seen from the transcript, "all issues properly raised under Article 795" had not been resolved before the jurors were sworn as a group. Furthermore, to the extent that the trial court was laboring under the impression that it lacked the ability to recall the dismissed jurors it had just released, see State v. Nelson , 85 So.3d at 34 ("Nationally, courts have formulated various remedies for a Batson violation, including recalling excused jurors[.]") Further, all of the jurors, except those released after being successfully challenged for cause, had been required to remain in the courtroom all day.
Due to the Batson -related legal errors that permeated the entire voir dire proceedings, we find that ordering an evidentiary hearing at which the parties would try to retroactively go through the three Batson steps would be unfeasible.[18] As observed in footnote 13, the record that was developed in this case and the court minutes are less than clear. Consequently, we are compelled to reverse and order a new trial.
We pretermit discussion of the defendant's other assignments of error.
*1014 CONCLUSION
The defendant's conviction and sentence are vacated. The matter is remanded for a new trial.
CONVICTION AND SENTENCE VACATED; REMANDED FOR NEW TRIAL.
APPLICATION FOR REHEARING
Before Felicia Toney Williams, Daniel Milton Moore III, Frances Jones Pitman, Jeanette Giddens Garrett - Writing and Shonda D. Stone, JJ.
Rehearing denied.

La. R.S. 14:67 was amended by Acts 2010, No. 585, to increase the threshold for the highest grade of theft from $500 to $1,500; the penalty was not changed. The amendment became effective on August 15, 2010. However, we find this error harmless given the charged amount exceeds $500 and the trial court sentenced the defendant within the sentencing guidelines required by the statute at the time of the offense. The maximum sentence for both theft of $1,500 under the current statute and for theft of $500 under the prior statute is ten years. State v. Biddy , 2013-0356 (La. App. 4 Cir. 11/20/13), 129 So.3d 768.

Review of the sentencing hearing transcript reveals that the trial court noted that the allegation at trial was that the defendant had stolen "[t]hirty-nine [t]housand plus" and that she had been convicted of theft over $1,500. However, the trial court failed to specify the amount of restitution that the defendant was ordered to pay.
If restitution is ordered as a condition of probation, it is to be "a reasonable sum not to exceed the actual pecuniary loss to the victim in an amount certain" [La. C. Cr. P. art. 895.1(A)(1) ] and "in an amount to be determined by the court" [La. C. Cr. P. art. 895(A)(7) ]. When the trial court fails to set a specific amount to be paid in restitution as a special condition of probation, the defendant's sentence is defective. State v. Wilson , 613 So.2d 234 (La. App. 1 Cir. 1992), writ denied , 93-0533 (La. 3/25/94), 635 So.2d 238. The court may also order restitution as part of the principal sentence under La. C. Cr. P. art. 883.2, in which case a nonspecific restitution order will render the sentence indeterminate and thus invalid. State v. Fussell , 06-2595 (La. 1/16/08), 974 So.2d 1223.
Were we not vacating the conviction and sentence due to Batson issues, we would have been required to vacate the sentence and remand the matter on this basis.

We note that in State v. Coleman , 06-0518 (La. 11/2/07), 970 So.2d 511, the Louisiana Supreme Court did not review sufficiency of the evidence prior to reversing the defendant's conviction and remanding for a new trial due to Batson violations. However, under similar circumstances, it did review sufficiency in State v. Crawford , 14-2153 (La. 11/16/16), 218 So.3d 13. Because we are unable to ascertain a clear reason for this distinction, we elect to err on the side of caution and consider sufficiency before reaching the Batson issues, which we find to have merit.

The state established the duties of and the procedures followed by the water collections clerk by presenting the testimony of the employees who preceded and followed the defendant in that position. For several years, Louria Dell Jefferson, who began working for the Town in 1980, had served as both the billing clerk and the collections clerk in the water department. At some point, a separate collections clerk was hired and Jefferson continued in her role as the billing clerk. Jefferson trained the defendant. Laverne Willis was hired to fill the collections clerk position about two weeks after the defendant was suspended in October 2010. She was trained by Jefferson and Theresa Burris, the Town clerk. Numerous photographs and a diagram depicting the layout of the city hall were introduced into evidence.
The defendant corroborated much of their testimony about the collections procedures and supplied additional details when she testified on her own behalf.

The defendant testified that sometimes unnamed "town employees," who were "[g]uys that worked in the field," would take it to the bank for her if she had somewhere to go that evening; however, she said this happened "[n]ot that often."

In April 2009, Theresa Burris began working for the Town; she subsequently became the Town clerk. During the investigation of the defendant in the instant case, it was discovered that Burris had committed thefts involving Town checks. In August 2015, she pled guilty to stealing $49,829.93 from the Town by printing double paychecks for herself and printing checks for invoices already paid, which she endorsed and deposited into her checking account. She also stole and endorsed to herself checks written to the Town. She also used $5,961 in Town funds to pay her portion of her retirement contributions. However, none of these offenses involved thefts of cash.

The defense attempted to subpoena Carraway for trial. Unfortunately, the record indicates he was unable to attend because he was gravely ill.

See footnote 1.

In addition to the Batson claims, the defendant has urged other errors, including the denial of her challenges for cause; the trial court's unilateral dismissal of a prospective juror; and the constitutionality of La. C. Cr. P. art. 800(B). Since this case is being reversed on the Batson issues, we need not address these.

The statute was amended by Acts 1990, No. 713, to include the following language:
C. No peremptory challenge made by the state shall be based solely upon the race of the juror. Whenever it appears that the state is systematically excluding jurors on the basis of race, the defense may demand a disclosure of reasons for the challenge. Neither the demand nor the disclosure shall be made within the hearing of any juror or prospective juror.
D. (1) When a demand for disclosure has been made under Paragraph C of this Article, the court shall determine whether there exists an apparent systematic exclusion of jurors on the basis of race.
(2) In making this determination, the court shall not consider any jurors who have been peremptorily challenged by the defense or who have been excused for cause.
(3) If the court finds an apparent systematic exclusion upon the basis of race, it shall then require a statement of reasons for the exercise of peremptory challenges, but only as to those jurors considered in making the finding of apparent systematic exclusion.
E. The court shall allow to stand each peremptory challenge for which a satisfactory racially neutral reason is given. Those jurors who have been peremptorily challenged, and for whom no satisfactory racially neutral reason is given may be ordered returned to the panel, or the court may take such other corrective action as it deems appropriate under the circumstances. The court shall make specific findings regarding each such challenge, and shall give specific reasons for the corrective action taken. [Emphasis added.]

The 1993 and 2008 versions of the statute were essentially the same. The 2008 amendment only added language to include challenges based on gender.

The highlighted portion of this section - which affords the trial court the discretion to overrule a Batson objection, following the making of a prima facie case supporting the objection, without requiring the state to set forth its reasons for a challenged peremptory strike - has been called into question. See State v. Crawford , supra ; State v. Elie , supra.

The record in the instant matter is surprisingly unhelpful on the vital issue of the race and gender of the prospective jurors and, on at least one occasion, inaccurate. The minutes, which contained notations as to the race and gender of each prospective juror, characterized alternate Kelli Thomas as "W/M," but the trial court described her as a white female in the transcript.
For the first panel, the transcript contains descriptions of the race and gender for only 12 of the 19 prospective jurors, all of which match their descriptions in the minutes. Another prospective juror, who was successfully challenged for cause by the state because he was married to the defendant's cousin, is described in the minutes as "B/M." A woman successfully challenged by the defense is described in the minutes as "W/F." The five remaining persons, two women and three men, served on the jury. Both women are described as "W/F," and one of the men as "W/M." The two remaining men are described in the minutes as "B/M."
For the second panel, the transcript contains descriptions of the race and gender for only 11 of the 14 prospective jurors. Additionally, Catherine Cole, who was successfully challenged for cause by the defense, is described by the prosecutor on one page of the transcript as a white female; three pages later, the trial judge described her as a black female. In the minutes, she is described as "W/F." Georgiana Cato, who was dismissed by the court on its own volition after denying the state's challenge for cause against her, is described in the minutes as "B/F." While both the state and the defense assert in brief that she was a black female, we have been unable to find verification of this in the transcript. The last one, a woman who served on the jury, is described as "W/F." Since the trial court stated on the record that the jury consisted of two black males and four white jurors, this and the designation of the jurors from the first panel appear to be correct.

Our review of the record indicates that all four of the state's peremptory challenges were utilized against African Americans. Of the state's challenges for cause all but one were used against African Americans. The only white person challenged for cause by the state had health issues. Both joint challenges for cause were against white persons - the mayor's son and a woman who was ill.

We have emphasized those sections of the transcript in bold print.

During oral argument before this court, the state attempted for the first time to present race-neutral reasons as to jurors who had been excused, the second step of Batson . Since this information was not presented at trial, the panel did not permit it to do so, and appellate counsel, who was not involved in the trial proceedings, candidly admitted the attempt was inappropriate.

In the Crawford case, the Louisiana Supreme Court vacated a defendant's convictions and sentences and ordered a new trial after the trial court conflated or merged the three Batson steps. The Court further found that inconsistent statements in the record demonstrated problems with all three steps of Batson . In the instant case, we arguably have a worse situation in that the trial court failed to properly take any of the Batson steps.

See the suggestion made by Justice Crichton in his dissent in part in State v. Crawford , supra .